0 6 - 7 8 6

Page 2

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District *OF Delaware* | |
|---|---|---|
| Name (under which you were convicted): *LYNN HARRIS* | | Docket or Case No.: |
| Place of Confinement: *Delaware Correctional Center* | | Prisoner No.: *297441* |

| Petitioner (include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) |
|---|---|
| *Lynn Harris* | v. *Thomas Carroll* |
| The Attorney General of the State of | *Delaware* |

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: ____
   *Superior Court of New Castle County*

   _____

   (b) Criminal docket or case number (if you know): *193*

2. (a) Date of the judgment of conviction (if you know): *2-19-04*

   (b) Date of sentencing: *4-23-04*

3. Length of sentence: *11 Years*

4. In this case, were you convicted on more than one count or of more than one crime? Yes ☑ No ☐

5. Identify all crimes of which you were convicted and sentenced in this case: _____

   *Attempted First Degree Robbery*
   *Possession of A Firearm*
   *Conspiracy*

   _____

6. (a) What was your plea? (Check one)

   (1)    Not guilty ☑          (3)    Nolo contendere (no contest) ☐

   (2)    Guilty ☐              (4)    Insanity plea ☐

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or
   charge, what did you plead guilty to and what did you plead not guilty to? ____ ____

   _____

   _____

   _____



**FILED**

DEC 21 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ❑       Judge only ☑

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes ☑  No ❑

8. Did you appeal from the judgment of conviction?

Yes ☑  No ❑

9. If you did appeal, answer the following:

(a) Name of court: _____ $Supreme$ _____

(b) Docket or case number (if you know): _____ _____

(c) Result: _____ $AFFirm$ _____

(d) Date of result (if you know): _____

(e) Citation to the case (if you know): _____

(f) Grounds raised: $State$ $Failed$ $to$ $Prove$ $all$ $of$ $the$ $elements$

$of$ $Attempted$ $robbery$, $Officer$ $lack$ $of$ $reasonable$ $suspicion$

$to$ $stop$ $defendant$, $Fail$ $to$ $read$ $miranda$ $warning$ $time$

$of$ $arrest$, $Ineffective$ $assistance$ _____

_____

(g) Did you seek further review by a higher state court?    Yes    No ☑

If yes, answer the following:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Result: _____

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?    Yes ❑  No ☑

If yes, answer the following:

(1) Docket or case number (if you know): _____

Page 4

(2) Result: _____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions,

applications, or motions concerning this judgment of conviction in any state court?  ·

Yes ☑ No ☐

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _Superior Court_

(2) Docket or case number (if you know): __193__

(3) Date of filing (if you know): __march - 22 - 06__

(4) Nature of the proceeding: _rule 61 Postconviction_

(5) Grounds raised: _State Failed to Prove all the elements of_

_Attempted First Degree Robbery, Officer lack of_

_reasonable Suspicion to stop defendant, Failed to_

_read miranda warning time of arrest,_

_Ineffective Assistance_

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or

motion?      Yes ☐ No ☑

(7) Result: _Summarily Dismissed_

(8) Date of result (if you know): __June 13 - 06__

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition. application. or
motion?          Yes ☐  No ☑

(7) Result: _____

(8) Date of result (if you know): _____

(c) If you filed any third petition. application. or motion. give the same information: _____

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition. application. or
motion?          Yes ☐  No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your
petition, application, or motion?

(1) First petition:     Yes ☑  No ☐

(2) Second petition:   Yes ☐  No ☐

(3) Third petition:    Yes ☐  No ☐

(e) If you did not appeal to the highest state court having jurisdiction. explain why you did not:

_____

_____

_____

12. For this petition, state every ground on which you claim that you are being held in violation of
the Constitution, laws, or treaties of the United States. Attach additional pages if you have more
than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your
available state-court remedies on each ground on which you request action by the federal court.
Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting
additional grounds at a later date.

GROUND ONE: *Officers lack for Investigatory Stop*

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
*Whether The police had reasonable and articulable*
*Suspicion For investigatory stop of the defendant*
*violated his USCA, Amend 4, And Del C, Annotated*
*Constitution, article 1 thru 6 of title 11, Del C 1902*

(b) If you did not exhaust your state remedies on Ground One, explain why: _____

(c) Direct Appeal of Ground One:

   (1) If you appealed from the judgment of conviction, did you raise this issue?

     Yes ☑ No ☐

   (2) If you did not raise this issue in your direct appeal, explain why: _____

(d) Post-Conviction Proceedings:

   (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a
state trial court?   Yes ☑ No ☐

   (2) If your answer to Question (d)(1) is "Yes," state:

   Type of motion or petition: *PostConviction 61 motion*

   Name and location of the court where the motion or petition was filed: _____

   *Superior Court New Castle County*

Docket or case number (if you know): ___ _193_

Date of the court's decision: _____ _June - 13 - 06_

Result (attach a copy of the court's opinion or order, if available): _____

(3) Did you receive a hearing on your motion or petition?

Yes ☐   No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☑   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☑   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_Supreme Court New Castle County._

Docket or case number (if you know): ___ _321_

Date of the court's decision: _____ _September - 22 - 06_

Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: _____

GROUND TWO: _Officer Failed to read miranda rights time of arrest_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
_whether the defendant 5th Amendment rights were violated by police when Failed to Administer defendant miranda warning at time he was arrested and taken into custody_

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

(c) Direct Appeal of Ground Two:

    (1) If you appealed from the judgment of conviction, did you raise this issue?

       Yes ☑  No ☐

    (2) If you did not raise this issue in your direct appeal, explain why: _____

(d) Post-Conviction Proceedings:

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

       Yes ☑  No ☐

    (2) If your answer to Question (d)(1) is "Yes," state:

    Type of motion or petition: *Postconviction 61 motion*

    Name and location of the court where the motion or petition was filed: _____

    *Superior Court New Castle County*

    Docket or case number (if you know): *193*

    Date of the court's decision: *June-13-06*

    Result (attach a copy of the court's opinion or order, if available): _____

    (3) Did you receive a hearing on your motion or petition?

       Yes ☐  No ☑

    (4) Did you appeal from the denial of your motion or petition?

       Yes ☑  No ☐

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

       Yes ☑  No ☐

    (6) If your answer to Question (d)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

    *Supreme Court New Castle County*

Page 9

Docket or case number (if you know): __321__

Date of the court's decision: __September-22-06__

Result (attach a copy of the court's opinion or order, if available): _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

GROUND THREE: _Ineffective Assistance of Counsel_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_whether counsel was ineffective when he failed
to file timely notice of appeal which is his
continued obligation pursuant to the supreme
court rule 26A in violation of his 6th Amendment
plus 14th Amendment Due Process right_

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

(c) Direct Appeal of Ground Three:

(1) If you appealed from the judgment of conviction, did you raise this issue?
Yes ☑ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?     Yes ☑   No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _Postconviction   61 motion_

Name and location of the court where the motion or petition was filed: _____

_Supericourt New Castle County_

Docket or case number (if you know): _193_

Date of the court's decision: _June - 13-06_

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐   No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☑   No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☑   No ☐

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_Supreme court New Castle County_

Docket or case number (if you know): _321_

Date of the court's decision: _September-22-06_

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

_____

_____

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: _____

_____

_____

GROUND FOUR: *State Failed to Prove elements*
*of Attempted First degree Robbery*

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
*whether the state Failed to prove their case beyond*
*a reasonable doubt under the Corpus Delicti Rule*
*to support the conviction of Attempted Robbery First degree*
*with a deadly weapon charge, in their case deprived*
*the appellant to a Fair trial under the 5th Amendment*
*Plus denial of his Due process right's under the*
*14th Amendment*

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c) Direct Appeal of Ground Four:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☑ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a

state trial court?    Yes ☑ No ☐

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: *PostConviction  61 motion*

Name and location of the court where the motion or petition was filed: _____

*Superior Court New Castle County*

Docket or case number (if you know): ___ *193*

Date of the court's decision: ___ *June - 13 - 0 6*

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☑ No ☐

(5) If your answer to Question (d)(4) is "Yes." did you raise this issue in the appeal?

Yes ☑ No ☐

(6) If your answer to Question (d)(4) is "Yes." state:

Name and location of the court where the appeal was filed: _____

_Supreme Court New Castle County_____

Docket or case number (if you know): ___ _321_____ `·` _____

Date of the court's decision: ____ _September - 22 - 06_____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

_____

_____

_____

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    Yes ☑ No ☐

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

_____

_____

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: _____

_____

14. Have you previously filed any type of petition. application. or motion in a federal court regarding the conviction that you challenge in this petition?    Yes ☐ No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. _____

_____
_____
_____
_____
_____

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?   Yes ☐   No ☑
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____
_____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing: _____

(b) At arraignment and plea: _____

(c) At trial: _William  Deely_____

(d) At sentencing: _William  Deely_____

(e) On appeal: _____

(f) In any post-conviction proceeding: _____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes ☐  No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: _____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?   Yes ❏   No ❏

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

bar your petition.* _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

    (1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —

(continued...)

Page 15

Therefore, petitioner asks that the Court grant the following relief: _Order For_
_release petitioner From unlawFul_
_imprisonment_

or any other relief to which petitioner may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct
and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on
_____ (month, date, year).

Executed (signed) on ___12-18-06___ (date).

_Lynn Charris_

Signature of Petitioner

---

*(...continued)

(A) the date on which the judgment became final by the conclusion of direct review or the
expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in
violation of the Constitution or laws of the United States is removed, if the applicant was
prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the
Supreme Court, if the right has been newly recognized by the Supreme Court and made
retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been
discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral
review with respect to the pertinent judgment or claim is pending shall not be counted toward
any period of limitation under this subsection.

# Certificate of Service

I, _Lynn Adarris JR_ , hereby certify that I have served a true

and correct cop(ies) of the attached: _____

_____ upon the following

parties/person (s):

1 COPY

Superior Court
TO: _Prothonotary Office_          TO: _____

_500 N. King Street_               _____

_Wilmington, Del 19801_            _____

_____       _____

_____       _____


2 copies

TO: _Clerk, United States_          TO: _____

_District Court of Delaware_        _____

_844 North King Street_             _____

_Wilmington, De, 19801_             _____

_____        _____


**BY PLACING SAME IN A SEALED ENVELOPE** and depositing same in the United
States Mail at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, DE
19977.

On this _____ day of _12|18|06_ _____, ~~2005~~

Lynn Adarris JR

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. _____

_____
_____

## IN FORMA PAUPERIS DECLARATION

[Insert appropriate court]

* * * * *

13050052973

#43

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE          **Page 1**
IN AND FOR __**NEW CASTLE**_____COUNTY
STATE OF DELAWARE
              v.
___**LYNN HARRIS JR.**_____          In 03-05-0806 R/
Name of Movant on Indictment                           In 03-05-0808 R/

_____                      In 03-05-0811 - R/
Correct Full Name of Movant
)))))))
No. _____
(to be supplied by Prothonotary)
**MOTION FOR POSTCONVICTION RELIEF**
## MOTION FOR POSTCONVICTION RELIEF
**INSTRUCTIONS**
(1) This motion must be legibly handwritten or typewritten, and signed by the movant under
penalty of perjury.
(2) All grounds for relief and supporting facts must be included, and all questions must be
answered briefly in the proper space on the form.
(3) Additional pages are not permitted. If more room is needed, use the reverse side of the
sheet.
(4) No citation of authorities is required. If legal arguments are submitted, this should be done
in a separate memorandum.
(5) Only convictions that were included in the same plea agreement or were tried together may
be challenged in a single motion.
(6) When the motion is completed, the original must be mailed to the Prothonotary in the county
in which the judgment of conviction was entered. No fee is required.
(7) The motion will be accepted if it conforms to these instructions. Otherwise, it will be
returned with a notation as to the deficiency.
To return by mail:
New Castle County Prothonotary Kent County Prothonotary
500 N. King Street 38 The Green
Suite 500, Lower Level 1 Dover, DE 19901                **0 6 - 7 8 6**
Wilmington, DE 19801
Sussex County Prothonotary
P.O. Box 756
Georgetown, DE 19947



FILED

DEC 2 1 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

B1

**MOTION**                                                    <u>Page 2</u>

1. County in which you were convicted **_NEW
CASTLE**_____

2. Judge who imposed sentence **RICHARD R.
COOCH**_____

3. Date sentence was imposed **_APRIL 13,
2004**_____

4. Offense(s) for which you were sentenced and length of sentence (s):
__**ATTEMPTED ROBBERY PLUS PFDCF, TEN
YEARS.**_____
_____

_____

_____

5. Do you have any sentence(s) to serve other than the sentence(s) imposed
because of the
judgment(s) under attack in this motion? Yes ( ) No ( **X**)
If your answer is "yes," give the following information:
Name and location of court(s) which imposed the other sentence(s):

_____

_____

_____

Date sentence(s) imposed:
        **NONE**_____

Length of sentence(s)
        **NONE**_____

6. What was the basis for the judgment(s) of conviction? (Check one)
Plea of guilty ( )
Plea of guilty without admission of guilt ("Robinson plea") ( )
Plea of nolo contendere ( )
Verdict of jury ( )
Finding of judge (non-jury trial) (**X** )

7. Judge who accepted plea or presided at trial -**RICHARD R.
COOCH**_____

8. Did you take the witness stand and testify? (Check one)
No trial ( ) Yes (**X** ) No ( )

9. Did you appeal from the judgment of conviction? Yes (**X** ) No ( )
If your answer is "yes," give the following information:
Case number of appeal _**NO. 193**_____

Date of court's final order or opinion **APRIL 18,
2005**_____ ___

**Page 3**

10. Other than a direct appeal from the judgment(s) of conviction, have you filed any other
motion(s) or petition(s) seeking relief from the judgment(s) in state or federal court?
Yes ( ) No (**X** ) How many? ( )
If your answer is "yes," give the following information as to each:
Nature of proceeding(s)
___**NONE**_____

Grounds raised
___**NONE**_____

_____

_____

___
Was there an evidentiary
hearing?___**NONE**_____
Case number of proceeding(s)
_**NONE**_____
Date(s) of court's final order(s) or opinion(s)
_**NONE**_____
Did you appeal the
result(s)?__**NONE**_____
11. Give the name of each attorney who represented you at the following stages of the
proceedings relating to the judgment(s) under attack in this motion:
At plea of guilty or trial _**WILLIAM**
**DEELY**_____
On appeal____**WILLIAM**
**DEELY**_____
In any post conviction proceeding _____
12. State every ground on which you claim that your rights were violated. If you fail to set forth
all grounds in this motion, you may be barred from raising additional grounds at a later date. You
must state facts in support of the ground(s) which you claim. For your information, the following
is a list of frequently raised grounds for relief (you may also raise grounds that are not listed here):
double jeopardy; illegal detention, arrest, or search and seizure; coerced confession or guilty plea;

uninformed waiver of the right to counsel, to remain silent, or to speedy trial; denial of the right
to confront witnesses, to subpoena witnesses, to testify, or to effective assistance of counsel;
suppression of favorable evidence; unfulfilled plea agreement.

B4

**Ground one:** _ State fail to produce substantiv! evidence and /or prove their case beyond a reasonable doubt and meet the prerequisite's to support the conviction under the corpus delicti rule and the said statures of title 11301 and 222(5).

---

Supporting facts (state the facts briefly without citing cases):
**Whether the state failed to provide their case beyond a reasonable doubt under the corpus dialicti rule to support the conviction for attempted robbery with a deadly weapon charge. In their case in chief deprived the defendant to a fair trial under " the 5th Amendmer t plus denial of his due process rights under the 14th**
Amendment._____

---

**Ground two:** Officers lack for investigatory stop.

---

Supporting facts (state the facts briefly w thout citing cases):
**Whether the police had reasonable and articulable sus picion for investigatory stop of the defendant, violated his usca Amend 4 and Del,C Annotated Consti ution Articule 1-6 of title 11 Del c, 1902.**_____

---

**Ground three:** Officer failed to read Miranda Right time of

arrest._____

Supporting facts (state the facts briefly without citing cases):
**Whether the defendant 5th Amendment Right were violated by police when failed to administer defendant Miranda warning at time he was arrested and taken into custody.**_____

---

If any of the grounds listed were not previously raised, state briefly what grounds were not raised,
and give your reason(s) for not doing so:

**Ground four:** Ineffective assistance of counsel

Supporting facts / state facts briefly without citing case. **Whether counsel was ineffective when he failed to file a timely notice of appeal, which is his continued obligation pursuant to the Supreme Court rule 26A in violation of his 6th Amendment plus 14th Amendment due process rights.**

**If any of the grounds listed were not previously raised, state briefly what grounds were not raised, and give your reason(s) for not doing so: N/A**_____

Wherefore, movant asks that the court grant him all relief to which he may be entitled in this proceeding.

_____ PRO-SE_____
Signature of attorney (if any)

I declare the truth of the above under penalty of perjury.

Date Signed

Signature of Movant
(Notarization not required)

forms/mtnpcr.wpRevised 9/2002

B5

Ground one: _____
Supporting facts (state the facts briefly without citing cases):

_____

_____

_____

Ground two: _____

Supporting facts (state the facts briefly without citing cases):

_____

_____

_____

Ground three: _____
Supporting facts (state the facts briefly without citing cases):

_____

_____

If any of the grounds listed were not previously raised, state briefly what grounds were not raised, and give your reason(s) for not doing so: ___ _____

_____

_____

_____

_____

Wherefore, movant asks that the court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of attorney (if any)

I declare the truth of the above under penalty of perjury.

3/19/06
Date Signed

_Lynn Nilarris JR_
Signature of Movant
(Notarization not required)

forms/mtnpcr.wp
Revised 9/2002

3
B6

HCHU

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

|                                       |   |                    |
|---------------------------------------|---|--------------------|
| STATE OF DELAWARE                     | ) |                    |
|                                       | ) | I.D. #0305005239   |
| v.                                    | ) |                    |
|                                       | ) |                    |
| RYANT N. HARRIS A/K/A                 | ) |                    |
| LYNN HARRIS,                          | ) |                    |
|                                       | ) |                    |
| Defendant                             | ) |                    |
|                                       | ) |                    |

Submitted: March 22, 2006
Decided: June 13, 2006

Upon Defendant's Motion for Postconviction Relief.
**SUMMARILY DISMISSED.**

## ORDER

Stephen M. Walther, Esquire, Deputy Attorney General, Department of
Justice, Wilmington, Delaware, Attorney for the State.

Ryant N. Harris a/k/a Lynn Harris, Smyrna, Delaware, *pro se.*

COOCH, J.

This 13th day of June, 2006, upon consideration of Defendant's

motion for postconviction relief, it appears to the Court that:

1.      Ryant N. Harris a/k/a Lynn Harris ("Defendant")[1] was found guilty

and convicted, after a bench trial on February 19, 2004, of Attempted

---

[1] It is not clear from the record or the caption precisely what Defendant's name is.

B8

Robbery First Degree, Possession of a Firearm During the Commission of a

Felony, and Conspiracy Second Degree. On April 23, 2004, Defendant was

sentenced to a total of 10 years at Level V, followed by 3 years at decreasing

levels of supervision. Defendant appealed his conviction on four grounds:

(1) that the State failed to prove its case beyond a reasonable doubt, (2) that

the police lacked reasonable suspicion for the initial stop, (3) that his

Miranda rights were violated when the police, with weapons drawn, asked

Defendant if he had any weapons on h m, and (4) that trial counsel provided

ineffective assistance.[2] On April 11, 2005, the Delaware Supreme Court

affirmed the convictions.[3]

2. Defendant filed this timely moti on for postconviction relief pursuant

to Superior Court Criminal Rule 61 on March 22, 2006. Defendant alleges

similar, if not the exact same, grounds for postconviction relief as the

grounds brought upon direct appeal. These grounds are set forth here *in*

*toto*:

> 1. State fail [sic] to produce substantive evidence and/or prove their case
> beyond a reasonable doubt and meet t 1e prerequisite's [sic] to support the
> conviction under the corpus delicti rule and the said statures [sic] of tit e
> 11301 and 222(5).
> Supporting facts: Whether the state fa led to provide [sic] their case
> beyond a reasonable doubt under the c orpus delicti rule to support the
> conviction for attempted robbery with a deadly weapon charge. In their
> case in chief deprived the defendant tc a fair trial under the 5[th]

---

[2] *Harris v. State*, 2005 WL 850421 (Del. Supı.).

[3] *Id.* (affirming trial court's decisions regardir g the first three issues brought by defendant
on appeal and declining to consider defendant's ineffective assistance of counsel claim).

B9

Amendment plus denial of his due process rights under the 14th
Amendment.

2. Officers lack for investigatory stop.
Supporting facts: Whether the police had reasonable and articulable
suspicion for investigatory stop of the defendant, violated his usca Amend
4 [sic] and Del,C Annotated Articule 1 [sic] – 6 of title 11 Del c, 1902
[sic].

3. Officer failed to read Miranda Right time of arrest [sic].
Supporting facts: Whether the defendant 5th Amendment Right were
violated by police when failed to administer defendant Miranda warning
[sic] at time he was arrested and taken into custody.

4. Ineffective assistance of counsel.
Supporting facts: Whether counsel was ineffective when he failed to file a
timely notice of appeal, which is his continued obligation pursuant to the
Supreme Court rule 26A [sic] in violation of his 6th Amendment plus 14th
Amendment due process rights.

Upon review of Defendant's motion, all of the above grounds are conclusory

and, thus, the motion is **SUMMARILY DISMISSED.**

3.      Superior Court Criminal Rule 6 (d)(4) provides that "[i]f it plainly

appears from the motion for postconviction relief and the record of prior

proceedings in this case that the movant is not entitled to relief, the judge

may enter an order for its summary dismissal and cause the movant to be

notified." Defendant's motion for postconviction relief will be summarily

dismissed where no facts supporting Defendant's contentions are offered and

the claims are conclusory.[4]

---

[4] *State v. Cooper*, 2001 WL 1729147 (Del. Super.) (summarily dismissing defendant's
claims of false testimony and ineffective assistance of counsel as defendant did not offer
supporting facts and the claims were conclusory). *See also Jordan v. State*, 1994 WL
466142 (Del. Supr.); *State v. Brittingham*, 1994 WL 750341, * 2 (Del. Super.) (citing
*Younger v. State*, 580 A.2d at 556 (holding that conclusory allegations are legally
insufficient to prove ineffective assistance of counsel)).

3

B10

4.    Regardless of the fact that the grounds brought by Defendant in this

instant motion are almost mirror images of the issues brought on direct

appeal, Defendant's contentions here are completely conclusory as they are

not supported by any facts in the record nor by any case law brought to the

Court's attention by Defendant. They are merely reiterations of the issues

already decided by the Delaware Supreme Court. Thus, Defendant's first

three claims are **SUMMARILY DISMISSED.**

5.    The one issue not decided by the Supreme Court, Defendant's

ineffective assistance of counsel claim, is also conclusory because it points

to no facts or case law in support. Thus, Defendant fourth ground for

postconviction relief is conclusory and is **SUMMARILY DISMISSED.**

6.    For the reasons stated, Defendan's Motion for Postconviction Relief

is **SUMMARILY DISMISSED.**

       **IT IS SO ORDERED.**

Richard R. Cooch, J.

oc:    Prothonotary
cc:    Investigative Services
       William T. Deely, Esquire

4

B11

**CERTIFICATE OF SERVICE**

The undersigned, being a member of the Bar of the

Supreme Court of Delaware, hereby certifies that on August

15, 2006, he caused two copies of the attached document to

be placed in the U.S. Mail, first class postage prepaid,

addressed to the following:

Lynn Harris
No. 297441
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977

Loren C. Meyers
Chief of Appeals Division
Dept. of Justice

HUB

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE )
)
) I.D. #0305005239
v. )
)
RYANT N. HARRIS A/K/A )
LYNN HARRIS, )
)
Defendant )
)

Submitted: March 22, 2006
Decided: June 13, 2006

Upon Defendant's Motion for Postconviction Relief.
**SUMMARILY DISMISSED.**

## ORDER

Stephen M. Walther, Esquire, Deputy Attorney General, Department of
Justice, Wilmington, Delaware, Attorney for the State.

Ryant N. Harris a/k/a Lynn Harris, Smyrna, Delaware, *pro se.*

COOCH, J.

This 13th day of June, 2006, upon consideration of Defendant's

motion for postconviction relief, it appears to the Court that:

1.     Ryant N. Harris a/k/a Lynn Harris ("Defendant")[1] was found guilty

and convicted, after a bench trial on February 19, 2004, of Attempted

---

[1] It is not clear from the record or the caption precisely what Defendant's name is.

B8

Robbery First Degree, Possession of a Firearm During the Commission of a

Felony, and Conspiracy Second Degree. On April 23, 2004, Defendant was

sentenced to a total of 10 years at Level V, followed by 3 years at decreasing

levels of supervision. Defendant appealed his conviction on four grounds:

(1) that the State failed to prove its case beyond a reasonable doubt, (2) that

the police lacked reasonable suspicion for the initial stop, (3) that his

Miranda rights were violated when the police, with weapons drawn, asked

Defendant if he had any weapons on h m, and (4) that trial counsel provided

ineffective assistance.[2] On April 11, 2005, the Delaware Supreme Court

affirmed the convictions.[3]

2.    Defendant filed this timely motion for postconviction relief pursuant

to Superior Court Criminal Rule 61 on March 22, 2006. Defendant alleges

similar, if not the exact same, grounds for postconviction relief as the

grounds brought upon direct appeal. These grounds are set forth here *in*

*toto*:

> 1. State fail [sic] to produce substantive evidence and/or prove their case
> beyond a reasonable doubt and meet t1e prerequisite's [sic] to support the
> conviction under the corpus delicti rule and the said statures [sic] of tite
> 11301 and 222(5).
> Supporting facts: Whether the state fa led to provide [sic] their case
> beyond a reasonable doubt under the corpus delicti rule to support the
> conviction for attempted robbery with a deadly weapon charge. In their
> case in chief deprived the defendant to a fair trial under the 5[th]

---

[2] *Harris v. State*, 2005 WL 850421 (Del. Supr.).

[3] *Id.* (affirming trial court's decisions regardir g the first three issues brought by defendant
on appeal and declining to consider defendant's ineffective assistance of counsel claim).

B9

## CERTIFICATE OF SERVICE

The undersigned, being a member of the Bar of the
Supreme Court of Delaware, hereby certifies that on August
15, 2006, he caused two copies of the attached document to
be placed in the U.S. Mail, first class postage prepaid,
addressed to the following:

Lynn Harris
No. 297441
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977

Loren C. Meyers
Chief of Appeals Division
Dept. of Justice

305005293

#43

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE          **Page 1**
IN AND FOR __**NEW CASTLE**_____ _____COUNTY
STATE OF DELAWARE

v.

___**LYNN HARRIS JR.**_____ _____          In03-05-0806- R/

Name of Movant on Indictment          In 03-05-0808_ R/

_____ _____          In 03-05-081.6 -R/

Correct Full Name of Movant

))))))))

No. _____ _____

(to be supplied by Prothonotary)

**MOTION FOR POSTCONVICTION RELIEF**

## MOTION FOR POSTCONVICTION RELIEF

**INSTRUCTIONS**

(1) This motion must be legibly handwritten or typewritten, and signed by the movant under

penalty of perjury.

(2) All grounds for relief and supporting facts must be included, and all questions must be

answered briefly in the proper space on the form.

(3) Additional pages are not permitted. If more room is needed, use the reverse side of the

sheet.

(4) No citation of authorities is required. If legal arguments are submitted, this should be done

in a separate memorandum.

(5) Only convictions that were included in the same plea agreement or were tried together may

be challenged in a single motion.

(6) When the motion is completed, the original must be mailed to the Prothonotary in the county

in which the judgment of conviction was entered. No fee is required.

(7) The motion will be accepted if it conforms to these instructions. Otherwise, it will be

returned with a notation as to the deficiency.

To return by mail:

New Castle County Prothonotary Kent County Prothonotary

500 N. King Street 38 The Green

Suite 500, Lower Level 1 Dover, DE 19901

Wilmington, DE 19801

Sussex County Prothonotary

P.O. Box 756

Georgetown, DE 19947

**MOTION**                                                                          <u>Page 2</u>

1. County in which you were convicted **_NEW
CASTLE**_____ _____

2. Judge who imposed sentence **RICHARD R.
COOCH**_____

3. Date sentence was imposed **_APRIL 23,
2004**_____ _____ _____

4. Offense(s) for which you were sentenced and length of sentence (s):
**__ATTEMPTED ROBBERY PLUS PFDCF, TEN
YEARS.**_____

_____

_____

_____

_____ _____ _____ _____

5. Do you have any sentence(s) to serve other than the sentence(s) imposed because of the
judgment(s) under attack in this motion? Yes ( ) No ( **X**)
If your answer is "yes," give the following information:
Name and location of court(s) which imposed the other sentence(s):

_____

_____

_____

_____

Date sentence(s) imposed:
         **NONE**_____ _____

Length of sentence(s)
         **NONE**_____

6. What was the basis for the judgment(s) of conviction? (Check one)
Plea of guilty ( )
Plea of guilty without admission of guilt ("Robinson plea") ( )
Plea of nolo contendere ( )
Verdict of jury ( )
Finding of judge (non-jury trial) (**X** )

7. Judge who accepted plea or presided at trial -**RICHARD R.
COOCH**_____ __

8. Did you take the witness stand and testify? (Check one)
No trial ( ) Yes (**X** ) No ( )

9. Did you appeal from the judgment of conviction? Yes (**X** ) No ( )
If your answer is "yes," give the following information:
Case number of appeal **_NO. 193**_____ _____

Date of court's final order or opinion **APRIL 18,
2005**_____ ___

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LYNN HARRIS, | § | |
| | § | No. 321, 2006 |
| Defendant Below- | § | |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | in and for New Castle County |
| STATE OF DELAWARE, | § | Cr. ID No. 0305005293 |
| | § | |
| Plaintiff Below- | § | |
| Appellee. | § | |

Submitted: August 15, 2006
Decided: September 22, 2006

Before **STEELE**, Chief Justice, **HOLLAND** and **RIDGELY**, Justices

## O R D E R

This 22nd day of September 2006, upon consideration of the appellant's opening brief and the appellee's motion to affirm pursuant to Supreme Court Rule 25(a), it appears to the Court that:

(1)    The defendant-appellant, Lynn Harris, filed an appeal from the Superior Court's June 13, 2006 order summarily dismissing his motion for postconviction relief pursuant to Superior Court Criminal Rule 61.    The plaintiff-appellee, the State of Delaware, has moved to affirm the judgment of the Superior Court on the ground that it is manifest on the face of the opening brief that the appeal is without merit. We agree and AFFIRM.

1

the State failed to prove its case, that the police lacked reasonable suspicion to stop him and that the police failed to give him the proper Miranda warnings.

(6) In order to prevail on his claims of ineffective assistance of counsel, Harris must demonstrate that his counsel's representation fell below an objective standard of reasonableness and that, but for his counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceedings would have been different.[3] Although not insurmountable, the Strickland standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable."[4]

(7) As to Harris' first claim of ineffective assistance, the record reflects that, after Harris himself filed a notice of appeal in this Court, the Clerk instructed Harris' attorney to file a formal notice of appeal by a date certain. Because Harris' attorney did as the Clerk instructed, Harris' first contention is without merit. As to Harris' two remaining claims of ineffective assistance, the record reflects that a no-merit brief was filed on Harris' behalf under Supreme Court Rule 26(c), including the points that Harris wished this Court to consider. Ultimately, however, this Court determined that Harris' direct appeal was without merit. Harris has, thus,

---

[3] *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

[4] *Flamer v. State*, 585 A.2d 736, 753 (Del. 1990).

3

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

|  |  |
|---|---|
| STATE OF DELAWARE | ) |
|  | ) I.D. #0305005239 |
| v. | ) |
|  | ) |
| RYANT N. HARRIS A/K/A | ) |
| LYNN HARRIS, | ) |
|  | ) |
| Defendant | ) |
|  | ) |

Submitted: March 22, 2006
Decided: June 13, 2006

## Upon Defendant's Motion for Postconviction Relief.
### SUMMARILY DISMISSED.

## ORDER

Stephen M. Walther, Esquire, Deputy Attorney General, Department of
Justice, Wilmington, Delaware, Attorney for the State.

Ryant N. Harris a/k/a Lynn Harris, Smyrna, Delaware, *pro se.*

COOCH, J.

This 13th day of June, 2006, upon consideration of Defendant's

motion for postconviction relief, it appears to the Court that:

1.    Ryant N. Harris a/k/a Lynn Harris ("Defendant")[1] was found guilty

and convicted, after a bench trial on February 19, 2004, of Attempted

---

[1] It is not clear from the record or the caption precisely what Defendant's name is.

B8

Robbery First Degree, Possession of a Firearm During the Commission of a

Felony, and Conspiracy Second Degree. On April 23, 2004, Defendant was

sentenced to a total of 10 years at Level V, followed by 3 years at decreasing

levels of supervision. Defendant appealed his conviction on four grounds:

(1) that the State failed to prove its case beyond a reasonable doubt, (2) that

the police lacked reasonable suspicion for the initial stop, (3) that his

Miranda rights were violated when the police, with weapons drawn, asked

Defendant if he had any weapons on h m, and (4) that trial counsel provided

ineffective assistance.[2] On April 11, 2005, the Delaware Supreme Court

affirmed the convictions.[3]

2.    Defendant filed this timely motion for postconviction relief pursuant

to Superior Court Criminal Rule 61 on March 22, 2006. Defendant alleges

similar, if not the exact same, grounds for postconviction relief as the

grounds brought upon direct appeal. These grounds are set forth here *in*

*toto*:

> 1. State fail [sic] to produce substantive evidence and/or prove their case
> beyond a reasonable doubt and meet t1e prerequisite's [sic] to support the
> conviction under the corpus delicti rule and the said statures [sic] of title
> 11301 and 222(5).
> Supporting facts: Whether the state fa led to provide [sic] their case
> beyond a reasonable doubt under the corpus delicti rule to support the
> conviction for attempted robbery with a deadly weapon charge. In their
> case in chief deprived the defendant tc a fair trial under the 5[th]

---

[2] *Harris v. State*, 2005 WL 850421 (Del. Sup1.).

[3] *Id.* (affirming trial court's decisions regardir g the first three issues brought by defendant
on appeal and declining to consider defendant's ineffective assistance of counsel claim).

> Amendment plus denial of his due process rights under the 14th Amendment.
>
> 2. Officers lack for investigatory stop.
> Supporting facts: Whether the police had reasonable and articulable suspicion for investigatory stop of the defendant, violated his usca Amend 4 [sic] and Del,C Annotated Articule 1 [sic] – 6 of title 11 Del c, 1902 [sic].
>
> 3. Officer failed to read Miranda Right time of arrest [sic].
> Supporting facts: Whether the defendant 5th Amendment Right were violated by police when failed to administer defendant Miranda warning [sic] at time he was arrested and taken into custody.
>
> 4. Ineffective assistance of counsel.
> Supporting facts: Whether counsel was ineffective when he failed to file a timely notice of appeal, which is his continued obligation pursuant to the Supreme Court rule 26A [sic] in violation of his 6th Amendment plus 14th Amendment due process rights.

Upon review of Defendant's motion, all of the above grounds are conclusory and, thus, the motion is **SUMMARILY DISMISSED.**

3. Superior Court Criminal Rule 61(d)(4) provides that "[i]f it plainly appears from the motion for postconviction relief and the record of prior proceedings in this case that the movant is not entitled to relief, the judge may enter an order for its summary dismissal and cause the movant to be notified." Defendant's motion for postconviction relief will be summarily dismissed where no facts supporting Defendant's contentions are offered and the claims are conclusory.[4]

---

[4] *State v. Cooper*, 2001 WL 1729147 (Del. Super.) (summarily dismissing defendant's claims of false testimony and ineffective assistance of counsel as defendant did not offer supporting facts and the claims were conclusory). *See also Jordan v. State*, 1994 WL 466142 (Del. Supr.); *State v. Brittingham*, 1994 WL 750341, * 2 (Del. Super.) (citing *Younger v. State*, 580 A.2d at 556 (holding that conclusory allegations are legally insufficient to prove ineffective assistance of counsel)).

4. Regardless of the fact that the grounds brought by Defendant in this instant motion are almost mirror images of the issues brought on direct appeal, Defendant's contentions here are completely conclusory as they are not supported by any facts in the record nor by any case law brought to the Court's attention by Defendant. They are merely reiterations of the issues already decided by the Delaware Supreme Court. Thus, Defendant's first three claims are **SUMMARILY DISMISSED.**

5. The one issue not decided by the Supreme Court, Defendant's ineffective assistance of counsel claim, is also conclusory because it points to no facts or case law in support. Thus, Defendant fourth ground for postconviction relief is conclusory and is **SUMMARILY DISMISSED.**

6. For the reasons stated, Defendant's Motion for Postconviction Relief is **SUMMARILY DISMISSED.**

**IT IS SO ORDERED.**

Richard R. Cooch, J.

oc: Prothonotary
cc: Investigative Services
    William T. Deely, Esquire

4

B11

## CERTIFICATE OF SERVICE

The undersigned, being a member of the Bar of the Supreme Court of Delaware, hereby certifies that on August 15, 2006, he caused two copies of the attached document to be placed in the U.S. Mail, first class postage prepaid, addressed to the following:

Lynn Harris
No. 297441
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977

Loren C. Meyers
Chief of Appeals Division
Dept. of Justice

0305005293

#43

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE          **Page 1**
IN AND FOR __**NEW CASTLE**_____ _____COUNTY
STATE OF DELAWARE

v.

___**LYNN HARRIS JR.**_____ _____          $In03-05-0806-R/$
Name of Movant on Indictment                                    $In03-05-0808-R/$
                                                                  $In03-05-0811-R/$
Correct Full Name of Movant
)))))))
No. _____
(to be supplied by Prothonotary)
**MOTION FOR POSTCONVICTION RELIEF**
**MOTION FOR POSTCONVICTICN RELIEF**
**INSTRUCTIONS**
(1) This motion must be legibly handwritten or typewritten, and signed by the movant under
penalty of perjury.
(2) All grounds for relief and supporting facts must be included, and all questions must be
answered briefly in the proper space on the form.
(3) Additional pages are not permitted. If more room is needed, use the reverse side of the
sheet.
(4) No citation of authorities is required. If legal arguments are submitted, this should be done
in a separate memorandum.
(5) Only convictions that were included in the same plea agreement or were tried together may
be challenged in a single motion.
(6) When the motion is completed, the original must be mailed to the Prothonotary in the county
in which the judgment of conviction was entered. No fee is required.
(7) The motion will be accepted if it conforms to these instructions. Otherwise, it will be
returned with a notation as to the deficiency.
To return by mail:
New Castle County Prothonotary Kent County Prothonotary
500 N. King Street 38 The Green
Suite 500, Lower Level 1 Dover, DE 19901
Wilmington, DE 19801
Sussex County Prothonotary
P.O. Box 756
Georgetown, DE 19947

**MOTION**                                                    <u>Page 2</u>

1. County in which you were convicted _**NEW CASTLE**_____

2. Judge who imposed sentence **RICHARD R. COOCH**_____

3. Date sentence was imposed _**APRIL 23, 2004**_____

4. Offense(s) for which you were sentenced and length of sentence (s):
_**ATTEMPTED ROBBERY PLUS PFDCF, TEN YEARS.**_____

_____

_____

_____

5. Do you have any sentence(s) to serve other than the sentence(s) imposed because of the
judgment(s) under attack in this motion? Yes ( ) No ( **X**)
If your answer is "yes," give the following information:
Name and location of court(s) which imposed the other sentence(s):

_____

_____

_____

_____

Date sentence(s) imposed:
        **NONE**_____

Length of sentence(s)
        **NONE**_____

6. What was the basis for the judgment(s) of conviction? (Check one)
Plea of guilty ( )
Plea of guilty without admission of guilt ("Robinson plea") ( )
Plea of nolo contendere ( )
Verdict of jury ( )
Finding of judge (non-jury trial) (**X** )
7. Judge who accepted plea or presided at trial -**RICHARD R. COOCH**_____

8. Did you take the witness stand and testify? (Check one)
No trial ( ) Yes (**X** ) No ( )
9. Did you appeal from the judgment of conviction? Yes (**X** ) No ( )
If your answer is "yes," give the following information:
Case number of appeal _**NO. 193**_____
Date of court's final order or opinion **APRIL 18, 2005**_____

BZ

**Page 3**

10. Other than a direct appeal from the judgment(s) of conviction, have you filed any other

motion(s) or petition(s) seeking relief from the judgment(s) in state or federal court?

Yes ( ) No (**X** ) How many? ( )

If your answer is "yes," give the following information as to each:

Nature of proceeding(s)

___**NONE**_____ _____

Grounds raised

___**NONE**_____

_____

_____

_____

___

Was there an evidentiary

hearing?___**NONE**_____ _____

Case number of proceeding(s)

_**NONE**_____ _____

Date(s) of court's final order(s) or opinion's)

_**NONE**_____ _____

Did you appeal the

result(s)? __**NONE**_____ _____

11. Give the name of each attorney who represented you at the following stages of the

proceedings relating to the judgment(s) under attack in this motion:

At plea of guilty or trial _**WILLIAM**

**DEELY**_____ _____

On appeal____**WILLIAM**

**DEELY**_____ _____ _____

In any post conviction proceeding _____

12. State every ground on which you claim that your rights were violated. If you fail to set forth

all grounds in this motion, you may be barred from raising additional grounds at a later date. You

must state facts in support of the ground(s) which you claim. For your information, the following

is a list of frequently raised grounds for relief (you may also raise grounds that are not listed here):

double jeopardy; illegal detention, arrest, o· search and seizure; coerced confession or guilty plea;

B3

uninformed waiver of the right to counsel, to remain silent, or to speedy trial; denial of the right
to confront witnesses, to subpoena witnesses, to testify, or to effective assistance of counsel;
suppression of favorable evidence; unfulfilled plea agreement.

**Ground one:** __ State fail to produce substantive evidence and /or prove their case beyond a reasonable doubt and meet the prerequisite's to support the conviction under the corpus delicti rule and the said statures of title 11301 and 222(5).

Supporting facts (state the facts briefly without citing cases):
Whether the state failed to provide their case beyond a reasonable doubt under the corpus delicti rule to support the conviction for attempted robbery with a deadly weapon charge. In their case in chief deprived the defendant to a fair trial under " the 5th Amendment plus denial of his due process rights under the 14th Amendment._____

**Ground two:** Officers lack for investigatory stop.

Supporting facts (state the facts briefly without citing cases):
Whether the police had reasonable and articulable suspicion for investigatory stop of the defendant, violated his usca Amend 4 and Del,C Annotated Constitution Articule 1-6 of title 11 Del c, 1902._____

**Ground three:** Officer failed to read Miranda Right time of

arrest._____
Supporting facts (state the facts briefly without citing cases):
Whether the defendant 5th Amendment Right were violated by police when failed to administer defendant Miranda warning at time he was arrested and taken into custody._____

If any of the grounds listed were not previously raised, state briefly what grounds were not raised,
and give your reason(s) for not doing so:

**Ground four:** Ineffective assistance of counsel

Supporting facts / state facts briefly without citing case. Whether counsel was ineffective when he failed to file a timely notice of appeal, which is his continued obligation pursuant to the Supreme Court rule 26A in violation of his 6th Amendment plus 14th Amendment due process rights.

If any of the grounds listed were not previously raised, state briefly what grounds were not raised, and give your reason(s) for not doing so: **N/A**_____

Wherefore, movant asks that the court grant him all relief to which he may be entitled in this proceeding.

_____ PRO-SE_____
Signature of attorney (if any)

I declare the truth of the above under penalty of perjury.

_____                    _____
Date Signed                        Signature of Movant
                                   (Notarization not required)

B5

Ground one: _____
Supporting facts (state the facts briefly without citing cases):

_____

_____

_____

Ground two: _____

Supporting facts (state the facts briefly without citing cases):

_____

_____

_____

Ground three: _____
Supporting facts (state the facts briefly without citing cases):

_____

_____

If any of the grounds listed were not previously raised, state briefly what grounds were not raised, and give your reason(s) for not doing so: _____

_____

_____

_____

_____

Wherefore, movant asks that the court grant him all relief to which he may be entitled in this proceeding.

_____
Signature of attorney (if any)

I declare the truth of the above under penalty of perjury.

3/19/06
Date Signed

*Lynn Harris JR*
Signature of Movant
(Notarization not required)

3
B6

13

onth Dupont Highway?

A.   Right here?

3    Q.   Yes.

4    A.   It's a traffic light.  There's no light.

5    Q.   No artificial lighting?

6    A.   No night-lights, so to speak.

7    Q.   Can you give us some idea of how far it is

8    from 325 South Dupont Highway to Dupont Highway

9    itself?

10   A.   Fifty feet maybe.

11   Q.   Okay.  Can you demonstrate, please, what

12   area you're referring to?

13   A.   Fifty feet to this area here.

14   Q.   Okay.  Now, did there come a time that -- I

15   believe you already indicated there came a time that

16   you responded to that area; correct?

17   A.   Yes.

18   Q.   And prior to responding to that area, what

19   information had you received with regard to any

20   criminal activity in the area?

21   A.   For this incident or prior?

22   Q.   For this particular incident.

23   A.   For this incident, the report came from a

---

14

1    subject that lived in the house right here at 325

2    South Dupont.  And the report was that there's a

3    vehicle in her driveway, which was not supposed to be

4    there.  And there were subjects getting out of the

5    vehicle, and they were putting on masks.  And one of

6    them grabbed what appeared to be a pipe and placed it

7    inside their clothing, got out from the vehicle, and

8    then walked in the northern direction towards

9    Pockets.

10   Q.   Now, was there any specific description with

11   regard to the hat itself?

12   A.   She described that as a mask.

13   Q.   Was there any indication of what was being

14   done with the mask?

15   A.   She said they just put masks on over their

16   heads and were walking towards Pockets.

17   Q.   Was there any indication as to where these

18   individuals were walking towards Pockets?

19   A.   North.  I mean, north towards Pockets, as I

20   recall.

21   Q.   But no specific route as to which was being

22   taken; correct?

23   A.   No.

---

15

1    Q.   Now, when you responded to the area, what

2    happened?

3    A.   As I responded, and we were en route to the

4    area, I was coming from New Castle area, so I was

5    coming south.  And as I arrived, actually another

6    unit arrived about the same time that I did.  And

7    these are going to be my patrol cars.  But as we

8    arrived, the other units stopped in the left lane,

9    and I had stopped on this shoulder right here,

10   because I noticed Mr. Harris walking northbound in

11   the southbound shoulder.  He was dressed in blue

12   coveralls and a knit hat on his head.

13   Q.   Now, at that point, all right, did you place

14   any significance on the knit hat?

15   A.   Yes, because I recall from the dispatch that

16   subjects exiting the vehicle were wearing masks.  And

17   a lot of times, from prior robberies, subjects use a

18   knit hat to cover their face to commit the robberies.

19   They cut holes out in the mask, and they use those to

20   cover their identity during the robberies.

21   Q.   Now, prior to arriving at the scene, I

22   believe you indicated that there was a reference to a

23   metal pipe?

---

16

1    A.   Correct.

2    Q.   And what information specifically did you

3    receive in reference to this metal pipe?

4    A.   Passed on through dispatch?

5    Q.   Yes.

6    A.   Dispatch advised that the person resided at

7    this residence, stated that when they got out, they

8    put the masks on.  One of them grabbed the pipe from

9    the vehicle, which she believed to be a pipe from the

10   vehicle, and placed it inside, or placed it inside

11   their clothing, and then began to walk towards

12   Pockets area.

13   Q.   Now, can you give us some idea of where this

14   individual you initially stopped, how far was it from

15   the intersection of North Dupont Highway?

16   A.   From right here.  Again, this is not to

17   scale, because I'm definitely not an artist; but he

18   was standing on the shoulder right next to this,

19   which would be the white solid line, just a few feet

20   south of the intersection.  It was enough that when I

21   stopped him and after contacting him, I was able to

22   look over and see the vehicle still parked in the

23   driveway.

---

A-69

17

Q. I want an approximation between where that
vehicle was and the individual that you stopped. I
know it's diagonal.

A. Approximately 50 feet there, and maybe ten,
250 or so feet this way. So, um, maybe 75 feet or
so, 100 feet.

Q. Was there anything that obstructed your
view?

A. Nothing at all. Much not to scale here, but
when I got out, I may have had contact with him.
There's nothing right here that blocked my view.
Like I said, the trees are in this area here. Um, I
was able to look right across and see the vehicle.

Q. What's the approximation on that diagonal?

A. Diagonal, approximately 75 feet.

Q. Could you put that in?

A. Draw it in across here?

Q. Sure.

A. (Corp. Slover complies.)

Okay.

Q. Now, what direction was this individual
walking?

A. Northbound.

18

Q. And would you reference that?

A. (Corp. Slover complies.)

Yes.

Q. Now --

A. North.

Q. How far from this -- did you know how far
was this individual from Pockets when you stopped
him?

A. A couple hundred -- I would say 150 feet
maybe south of --

Q. So about 50 yards?

A. 50 yards would be a good estimation. This
is where Pockets would be, so I would say 150 feet.

Q. How far is Pockets from the northbound lanes
of Dupont Highway?

A. Southbound lanes?

Q. Excuse me.

A. Approximately 50 feet. It basically sits
right on the roadway. Approximately 50 feet off the
road.

Q. And is there a parking lot in front of
Pockets?

A. Pockets actually faces this direction, and

19

the parking lot is in front of the business, but
north of the business.

Q. Can you describe the area between Pockets
and southbound 13?

A. Like I said, this is all tree area here,
this way. There's nothing that separates Pockets
from the southbound lanes of 13.

Q. Okay. Now, when you stopped this
individual, you stopped him on the shoulder; correct?

A. Correct.

Q. Can you describe the shoulder area?

A. It's a flat asphalt surface.

Q. Were there any other pedestrians or anybody
walking in that area?

A. No, sir.

Q. Is that the kind of area that pedestrians
normally walk?

A. No.

Q. Was this individual walking along the
highway without a light?

A. Yes.

Q. Now, can you tell the Court, please, what
was in your mind right before you pulled over?

20

A. As I just came from the dispatch -- I mean,
it was dispatch. It was subjects that placed masks
over their heads, and one of them placed a pipe in
their clothing. And they were walking from 325 South
Dupont to Pockets. Now, I knew that, obviously from
the dispatch, this vehicle -- these people weren't
supposed to be at 325 South Dupont Highway, okay?
They just placed masks over their heads, put a pipe
in -- what appeared to be a pipe inside their clothes
and were walking towards Pockets. From prior
complaints, you know, it sounded like a robbery was
getting ready to happen at Pockets.

Q. Can I ask you to stop a minute?

What significance did you place on the
report from the reporting person that it appeared to
be a pipe? How did you interpret that?

A. I know some people can -- you know, are not
familiar with certain guns or any kind of weapons.
So the significance in a pipe is this could be a
weapon that this person put inside their clothing,
and this reporting person may not be able to
determine that.

Q. But what conclusions did you draw from all

21

1  the circumstances available to you with regard to
2  that pipe description?
3      A.  It could possibly be a shotgun.
4      Q.  Were you concerned for your safety at all
5  when you stopped this individual?
6      A.  Absolutely.  Because like I said, my
7  thinking is this person might have a shotgun on them.
8  And when I pulled over to the shoulder, like I said,
9  one unit was in the right lane, and I was on the
10  shoulder.  And this subject, Mr. Harris, was walking
11  northbound, had the knit hat on, had coveralls on.
12  Um, so I mean, I immediately got out of my vehicle,
13  because, you know, I didn't -- at this point, I
14  didn't know if he had a weapon on him or not, and I
15  was concerned for my safety.  I don't want to be
16  sitting in a car when someone pulls out a weapon and
17  I'm sitting there.
18      Q.  Now, when you arrived, pulled up, were you
19  in a marked State Police --
20      A.  Yes, Delaware State --
21      Q.  The other vehicle was whom?
22      A.  Trooper McLaughlin.
23      Q.  Was that also a marked police vehicle?

22

1      A.  Yes.
2      Q.  When you responded, did you have your 360s
3  on?
4      A.  As I responded, no.
5      Q.  How about right before you stopped?
6      A.  As I stopped, we both activated our
7  equipment because, I mean, especially him, he's
8  sitting in the right lane.
9      Q.  When you say "him," who are you talking
10  about?
11      A.  I'm sorry.  Trooper McLaughlin.
12      Q.  Okay.  Would it be fair to say at that point
13  that he was seized, he wasn't free to leave, was he?
14      A.  That's correct.
15      Q.  All right.  What did you do next?
16      A.  Um, as I explained to you, I exited my
17  vehicle, because I didn't know if he had a weapon on
18  him or not.  I didn't want to be sitting in my
19  vehicle, if that's the case, so I asked him to turn
20  around for me, and I -- as I went to pat him down,
21  before I put my hands on him, he said, "Oh, I have a
22  shotgun inside my clothing."
23          At that point, I immediately took him into

23

1  custody, took a hold of the shotgun.  He had a gun.
2  I didn't want to go any further than what it already
3  has.
4      Q.  Did you pat him down?
5      A.  At that point, I patted him down, and I
6  actually felt the shotgun inside of his clothing, at
7  which time I unzippered the coveralls, removed the
8  shotgun from his clothing.
9      Q.  And did you then take him into custody?
10      A.  Yes.
11      Q.  Now, is that individual in the courtroom
12  today?
13      A.  Yes, he is.
14      Q.  Could you identify him, please?
15      A.  Mr. Harris is sitting here in the white DOCs
16  (indicating).
17          MR. WALTHER:  Let the record reflect the
18  witness has identified the defendant Lynn Harris also
19  known as Ryant Harris.  That's all I have.
20          Your Honor, could I have that marked as an
21  exhibit?
22          THE COURT:  You may.  Mark it as State's 1.
23          (State's Exhibit No. 1, a diagram, marked

24

1  for identification.)
2          THE PROTHONOTARY:  So marked, Your Honor.
3          THE COURT:  Thank you.
4          Mr. Deely, would you like Corporal Slover to
5  remain by the diagram?
6          MR. DEELY:  It'd probably be wise,
7  Your Honor.
8                  ------
9              CROSS-EXAMINATION
10                 ------
11  BY MR. DEELY:
12      Q.  Good afternoon, Corporal Slover.
13      A.  How are you?
14      Q.  Corporal Slover, do you remember what the
15  weather was that night?
16      A.  Clear.
17      Q.  It was clear?
18      A.  I'm sorry.  No.  I was afraid of that one.
19  It was raining very bad that night.  It was dark out.
20  And I remember being drenched that night from being
21  out in the rain, from being out on the scene that
22  night.
23      Q.  It was a cool evening, wasn't it?

error
of argument

25

1    A.  I don't remember the temperature, but I do
2  remember being drenched that night.
3      Q.  Do you remember exactly what the RECOM call
4  said?
5      A.  Well, I believe -- word for word, I don't
6  recall beyond that, but I believe I described that --
7      Q.  Let me go through it.  How many people got
8  out of the car at 325 Dupont Highway for the RECOM
9  call?
10     A.  According to RECOM, I don't recall exactly
11 how many got out of there.
12     Q.  More than one?
13     A.  Yes.
14     Q.  More than two?
15     A.  I don't recall exactly -- the exact number.
16     Q.  But it was more than one?
17     A.  Yes.
18     Q.  Did it say where the individuals went?  Did
19 RECOM tell you where they went?
20     A.  Northbound.  They're walking towards
21 Pockets.
22     Q.  Did they say anything else, give you any
23 description at all?

26

1      A.  Description of the subjects?
2      Q.  Yes.
3      A.  No.  They just -- what they dispatched to us
4  was the subjects.
5      Q.  You don't know if they were white or black,
6  or tall or short?
7      A.  No, sir.
8      Q.  Skinny or fat?
9      A.  No.
10     Q.  So you had no idea what they looked like?
11     A.  No.
12     Q.  All you knew was, there was more than one
13 individual; isn't that correct?
14     A.  Yes.
15     Q.  I'm going to go back to something you stated
16 on direct, when they said -- the dispatch said that
17 one of the individuals put what they believe was a
18 pipe in their pants.
19     A.  Yes.
20     Q.  And is it your testimony here today that
21 when somebody had put a pipe down their pants, you
22 immediately thought it was a shotgun?
23     A.  I did, yes.

27

1      Q.  So a pipe, in your mind, represented a
2  shotgun?
3      A.  Well, it could.  For example, to some folks'
4  eyes, it could, yes.
5          Go ahead.  I'm listening.  I'm sorry.
6      Q.  You responded to the scene, and you and
7  Trooper McLaughlin drove up to the intersection.  You
8  saw one individual; is that correct?
9      A.  Yes.
10     Q.  And you didn't see anybody else at that
11 intersection, did you?
12     A.  No.
13     Q.  And you said that you had a clear view over
14 to 325 South Dupont; is that correct?
15     A.  Yes.
16     Q.  Could you see the car that was parked in the
17 driveway?
18     A.  Yes.
19     Q.  Could you see if there was anybody in the
20 car?
21     A.  No.
22     Q.  But you had a clear view?
23     A.  Yes.

28

1      Q.  But you couldn't tell if there was anybody
2  in the car?
3      A.  It was dark, and it was raining.
4      Q.  Now, you knew that from RECOM.  Did they
5  tell you the car was parked in the driveway?
6      A.  Yes.
7      Q.  So you knew that car may be involved; is
8  that correct?
9      A.  Yes.
10     Q.  So as you, Trooper McLaughlin stopped
11 Mr. Harris on the street, one of you go over to 325
12 South Dupont?
13     A.  Not at this point, because my main concern
14 was Mr. Harris.
15     Q.  Well, he's an individual.  He's not in a
16 group.  There's nobody else around him.
17     A.  Right.  He's walking northbound, as
18 explained from the dispatch, wearing a knit hat on
19 his head.  And, um, like I said, he had coveralls on.
20 I thought that's possibly, you know, going to be the
21 guy with the pipe inside his clothing, so I'm --
22     Q.  I'm sorry?
23     A.  -- so my thoughts were directly on him.  My

A-72

29

1   concerns were on him.  Hey, let's make sure that
2   this -- you know, this is going to be our guy.
3       Q.  Did dispatch tell you if the people in 325
4   were continuing to observe anyone?
5       A.  At which point?
6       Q.  After they called up and said a number of
7   people got out of the car, put on what appeared to be
8   masks, somebody put pipes in their pants, where did
9   they say they went?
10      A.  Northbound --
11      Q.  Northbound?
12      A.  -- towards Pockets.
13      Q.  Did they say they could see them or lost
14  sight of them?
15      A.  Our dispatch, they walked northbound towards
16  Pockets, and they lost sight of them at that point.
17      Q.  But what you're telling us -- and that was
18  about five to ten minutes before you arrived on the
19  scene?
20      A.  Yes.
21      Q.  But what you're telling the Court here today
22  is that there was a clear view from 325 to where
23  Mr. Harris was; is that correct?

30

1       A.  To where Mr. Harris was, yes.
2       Q.  So they wouldn't have lost sight of
3   Mr. Harris?
4       A.  I don't know that.
5       Q.  Well, you said it was unobstructed, the
6   windows in front of the house.
7       A.  I don't recall if there were.
8       Q.  You said the view was unobstructed, at 325.
9       A.  The view from myself to the vehicle was
10  unobstructed, yes.
11      Q.  Could you see the house?
12      A.  Yes, I could see the house.
13      Q.  The view was unobstructed to the house;
14  correct?
15      A.  My view to the house was --
16      Q.  Somebody looking out, their view would be
17  unobstructed?
18      A.  I don't know whether they're looking from in
19  the house, so I can't...
20      Q.  If they're looking out the front of the
21  house, I assume the front --
22      A.  If they're standing on the outside, looking
23  across --

31

1           MR. DEELY:  May I approach, Your Honor?
2           THE COURT:  Yes, you may.
3           (Demonstration held.)
4   BY MR. DEELY:
5       Q.  This is the front of the house.
6       A.  Yes.  Wherever you're standing, off this
7   road or up over here, yes.
8       Q.  So if there were windows in the front of
9   this house, are there some windows?
10      A.  I don't remember exactly.
11      Q.  Let me put it this way:  If there was a
12  window in the front of this house, and they were
13  looking at this intersection, would they be able to
14  see Mr. Harris?
15      A.  Yes.
16      Q.  Unobstructed; is that correct?
17      A.  Yes.
18      Q.  So he wouldn't be out of their view; is that
19  correct?
20      A.  Yes.
21      Q.  So he wouldn't have gotten out of their
22  view; is that correct?
23      A.  Yes.

32

1       Q.  So you now pull up next to Mr. Harris.  You
2   activate your lights; is that correct?
3       A.  Yes.
4       Q.  What do you say to Mr. Harris?
5       A.  Well, as I exit my vehicle --
6       Q.  Before you exit the vehicle, did you say
7   anything?
8       A.  I didn't say anything to him.
9       Q.  You pulled up next to him.  What did he do?
10      A.  Like I said, he was standing kind of in
11  between our vehicles.  Our vehicles were closer than
12  this.  There was only a few feet in between our
13  vehicles, but I immediately exited my vehicle.
14      Q.  Let's back up --
15      A.  Sure.
16      Q.  -- please.
17          When you drove up, Mr. Harris was standing
18  at the intersection?
19      A.  No, just --
20      Q.  Just north?
21      A.  -- north.
22      Q.  A few feet.  You pulled up next to him and
23  Corporal McLaughlin drove on the opposite side?

37

1    A.  He's facing me.  So I advised him to turn
2    around.  So he's looking, like, this way.
3        Q.  Towards Trooper McLaughlin's car?
4        A.  Well, this is McLaughlin's car over here.
5    So he's looking, I guess it would be south.
6        Q.  So you said, "Turn around."
7        A.  Yes.
8        Q.  Did he turn around?
9        A.  Yes.
10       Q.  Did you tell him to stop, don't move?
11       A.  No.
12       Q.  You just got out of your car and said, turn
13   around?
14       A.  I said, turn around.  And he had turned
15   around.  And when he turned around, I asked him if he
16   had any weapons on him.  Before I ever patted him
17   down, he said he had a shotgun on him.
18       Q.  So did you ask him his name?
19       A.  At that point, I wasn't concerned about his
20   name.  I wanted to make sure he didn't have a weapon
21   on him.
22       Q.  So the very first words out of your mouth
23   when you got out --

38

1        A.  Absolutely.
2            THE COURT:  Wait a minute.  Let each other
3    finish.
4            MR. DEELY:  I understand.
5            THE COURT:  Answer when he's done asking the
6    question.
7    BY MR. DEELY:
8        Q.  You got out of your car and immediately
9    said, turn around?
10       A.  Yes.
11       Q.  And he complied?
12       A.  Yes.
13       Q.  And the next thing you did was, you started
14   to search him?
15       A.  I asked him if he had any weapons on him.
16       Q.  And he said, "Yes, I have a shotgun"?
17       A.  Yes.
18       Q.  That's your testimony here today?
19       A.  Yes.
20           MR. DEELY:  May I have a moment, Your Honor?
21           THE COURT:  Yes.
22           (Pause.)
23   BY MR. DEELY:

39

1        Q.  Corporal Slover, do you have your police
2    report?
3        A.  Yes, it's up -- may I approach?
4            MR. DEELY:  May he get it, Your Honor?
5            THE COURT:  Yes.
6            (Pause.)
7            (Corp. Slover retrieves report.)
8    BY MR. DEELY:
9        Q.  If you would look at the third paragraph of
10   your investigative narrative.
11       A.  (Corp. Slover complies.)
12           Sure.
13       Q.  Did you say that one of the first things you
14   said was, you advised the defendant to remove his
15   hands from his pockets?
16       A.  Yes.
17       Q.  So you didn't only say "turn around."
18       A.  Well, no, I guess I didn't only say "turn
19   around," no.
20       Q.  I'll go through the specifics with you
21   again, okay?
22           You pulled up next to him?
23       A.  Mm-hmm.

40

1        Q.  You got out of your car?
2        A.  Mm-hmm.
3        Q.  The first words out of your mouth were what?
4        A.  I advised him to remove his hands from his
5    pockets.
6        Q.  Did he comply?
7        A.  Yes.
8        Q.  So his hands were in plain view at that
9    time?
10       A.  At that time, yes.
11       Q.  And then you told him to turn around?
12       A.  Yes.
13       Q.  He turned around?
14       A.  Yes.
15       Q.  And without asking any further questions as
16   to what he was doing or why he was there, you began
17   to search him immediately?
18       A.  Yes.
19       Q.  Up to that point, up to that point, had you
20   seen any suspicious activity, other than the fact
21   that he had a knit cap and he was walking on the side
22   of the highway?
23       A.  No.

41

1     Q.  You made a statement on direct that walking
2 on the side of the highway was not a normal place for
3 pedestrians; is that correct?
4     A.  Correct.
5     Q.  Where would pedestrians normally walk in
6 that section of the highway if they were heading
7 northbound?
8     A.  Well, they would be more over towards the --
9 I guess right, or west.  I mean, they wouldn't be
10 walking right on the roadway.
11     Q.  He wasn't on the roadway itself.  He was on
12 the shoulder.
13     A.  He was walking a foot off the white line.
14 He's two feet from the vehicles going southbound on
15 13.
16     Q.  But he was off the shoulder.  He was on the
17 shoulder of the road.
18     A.  He was on the shoulder.
19     Q.  He was in the place where normal pedestrians
20 would walk if they were walking northbound on Route
21 13?
22     A.  Not in my opinion.
23     Q.  Well, he's on the shoulder of the road.

42

1 Isn't that where people are supposed to walk?
2     A.  Yeah, but he's on the -- a foot off the --
3 off the solid white line.  He's two feet from
4 vehicles traveling at 50 miles an hour southbound.
5     Q.  And you found that suspicious?
6     A.  I found that that's not where I would walk.
7     Q.  Did you find it suspicious?
8     A.  No.  I mean, that's not suspicious, but
9 that's not what you asked me.
10     Q.  So if he was three feet off the side of the
11 road, that would have been okay, in your opinion?
12     A.  No, if he was more towards where the asphalt
13 meets the grass area.
14     Q.  Now, in that same paragraph, the next
15 sentence says, "As you began to pat him down";
16 is that correct?
17     A.  Yes.
18     Q.  It says, "At that time, Mr. Harris advised
19 there was a shotgun in his clothing"?
20     A.  Yes.
21     Q.  It was not before you began to pat him down,
22 was it?
23     A.  Yes.

43

1     Q.  Would you read the sentence to the Court,
2 starting with, "As I began"?
3     A.  As I began to pat him down, "D" stated that
4 he had a shotgun inside his clothing.
5     Q.  That's different from what you testified to
6 earlier.  What you testified to earlier was -- let me
7 finish the question --
8     A.  Go ahead.
9     Q.  -- was that you got out of your car, told
10 him to turn around, amended that to, hands are in
11 plain view.  Then you told him to turn around, and at
12 that time you began to pat him down.  Is that your
13 testimony now?
14     A.  I went to pat him down, yes.
15     Q.  And as you were patting him down -- as you
16 began to pat him down, he said, "I have a shotgun in
17 my pants"?
18     A.  No.  As I began -- went to pat him down, as
19 I began, he stated that he had shotgun in his
20 clothing.
21     Q.  Well, he's not looking at you, so he doesn't
22 know you're beginning to pat him down.  He doesn't
23 know what you're doing behind him.

44

1     You're behind him at this point; right?  Is
2 it your testimony now he's facing away from you, and
3 not knowing what you're doing or what you're going to
4 ask him?
5     He says, "I have a shotgun in my clothes"?
6     A.  Yes.  I mean, as I explained to you, I
7 always ask people -- and as I did that night -- do
8 you have any weapons on you?  And as I began to pat
9 him down, he stated he had a shotgun.
10     Q.  What does "begin" mean?  You touched him?
11     A.  No, it doesn't.
12     Q.  What does it mean?
13     A.  As I began, as I went to, same thing.  I
14 just used a different word there, as I began.
15     Q.  So you walked up?
16     A.  If I was touching him, that would be during
17 a patdown.
18     Q.  So you walked up to the individual, said,
19 "Take your hands out of your pockets."  His hands are
20 in plain view.
21     A.  Correct.
22     Q.  Okay.  Did you tell him to do anything with
23 his hands after he took them out of his pocket?

$4-N_6$

45

1    A.  I don't recall.

2    Q.  But they're in plain view at that point?

3    A.  They're in plain view.

4    Q.  Trooper McLaughlin is in the car next to

5    you?

6    A.  Yes.

7    Q.  And he's watching what you're doing?

8    A.  I would assume.

9    Q.  Hope so?

10   A.  Right.  Exactly.

11   Q.  The procedure would be for him to be

12   watching; is that correct?

13   A.  Correct.

14   Q.  Did he get out of his car?

15   A.  I don't recall at that point, because my

16   attention was directed at Mr. Harris.

17   Q.  Now, Mr. Harris is standing there with his

18   hands out?

19   A.  Yes.

20   Q.  You had him turn around.  You haven't asked

21   him his name or anything at this point?

22   A.  Correct.

23   Q.  Is that correct?

46

1    A.  Yes.

2    Q.  And you immediately begin to search him?

3    A.  Yes.

4    Q.  Even though your report was -- there were

5    several people.  You got one individual, who is

6    walking innocently at this point.  You see no

7    suspicious activity; is that correct?

8    A.  That's correct.

9    Q.  He complied with all your commands; is that

10   correct?

11   A.  Yes.

12   Q.  And even the fact he complied with all the

13   commands, you made no attempt to find out what he was

14   doing in the area?

15   A.  At that point, my attention was solely on if

16   he had a weapon, okay?  I wanted to go home.  It's

17   at night.  So I want to make sure he doesn't have a

18   weapon on him.  I don't want this weapon to come out

19   and fire at me and...

20   Q.  I want to re-set the scene.

21   A.  Sure.

22   Q.  Two police officers, lights going, two

23   police officers with guns, defendant is compliant,

47

1    follows all your orders.  You've seen no suspicious

2    activity from this defendant.  You don't know if he

3    matches the description that was called in.  Are all

4    these things true up to this point?

5    A.  Other than matching the description, the

6    knit hat on his head.

7    Q.  And you immediately begin to pat him down?

8    A.  Correct.

9    MR. DEELY:  No further questions,

10   Your Honor.

11              ------

12              REDIRECT EXAMINATION

13              ------

14   BY MR. WALTHER:

15   Q.  Defense counsel asked you about whether the

16   occupant of 325 South Dupont Highway had an

17   unobstructed view from his front windows.  Do you

18   recall those questions?

19   A.  As he asked, unobstructed view to where I

20   stopped Mr. Harris.

21   Q.  Okay.  From the front of the --

22   A.  From the front of the house, if the house

23   had windows in the front, which I don't know.

48

1    Q.  Do you have any idea whatsoever, prior to

2    the stop, where the location of the reporting person

3    was at the time that he was reporting this

4    information?

5    A.  Other than at 325 South Dupont, I don't

6    know.  That's what I explained to the defense

7    counsel.

8    Q.  Right.  So if he was on the front step -- is

9    there a driveway or what?

10   A.  Exactly.

11   Q.  As you approached the vehicle, as you went

12   out, what were the first words you said, as you

13   recall today, to the defendant?

14   A.  As I recall --

15   Q.  Uh-huh.

16   A.  -- I had stated -- um, well, in my report,

17   which I stated that night, because I wrote this

18   report.  Back then was, "Remove your hands from your

19   pockets."  He had his hands in his pockets, and I

20   stated to him, "Do you have any weapons on you -- I'm

21   sorry.  I asked him to turn around, and stated, did

22   he have any weapons on you.  And, um, at which time,

23   I went to pat him down.  He stated that he had a

A-77

49

1    shotgun inside his clothing.

2        Q.    Before you laid a hand on him, did he tell

3    you he had a shotgun?

4        A.    Yes.

5            MR. WALTHER:  Nothing further -- excuse me.

6    May I ask one more question?

7            THE COURT:  Yes.

8    BY MR. WALTHER:

9        Q.    The information that you received from the

10    RECOM dispatcher with regard to this reporting

11    person, was that person ultimately interviewed and

12    cooperated in the investigation?

13        A.    Yes.

14        Q.    It wasn't an anonymous call, was it?

15        A.    No.

16            MR. WALTHER:  Nothing further.

17                ------

18            RECROSS-EXAMINATION

19                ------

20    BY MR. DEELY:

21        Q.    Officer, you just stated on redirect that

22    you didn't know where the people reporting out of 325

23    were as they were calling into the police; is that

50

1    correct?

2        A.    Correct.

3        Q.    But we do know they said they watched him go

4    in a certain direction?

5        A.    Correct.

6        Q.    And the car was in the driveway toward the

7    front of the house?

8        A.    Correct.

9        Q.    So to see what direction they went, they

10    head northbound, a place where they could be looking,

11    northbound; is that correct?

12        A.    Correct.

13        Q.    Okay.  So we don't know precisely where they

14    were standing, but we know generally what view they

15    had; is that correct?

16        A.    Correct.

17        Q.    When you stopped Mr. Harris, you stated that

18    you pulled your car up beside him, and Trooper

19    McLaughlin pulled up his car.  At that point, he was

20    not free to leave; is that correct?

21        A.    Yes.

22        Q.    Did you tell him to stop or halt or anything

23    to that effect?

51

1        A.    No.

2        Q.    You got out of the car and said, "Take your

3    hands out of your pockets"?

4        A.    Yes.

5        Q.    And then you said, "Turn around"?

6        A.    Yes.

7        Q.    And he complied in both cases?

8        A.    Yes.

9        Q.    At that time, you believed that he was a

10    suspect in a crime; is that correct?

11        A.    Yes.

12        Q.    And at that time, knowing he was a suspect

13    in a crime, and that he was not free to leave, did

14    you read him his Miranda rights --

15        A.    No.

16        Q.    -- but secured him, a question that may well

17    incriminate him in that crime that you were

18    investigating; is that correct?

19        A.    Yes, I asked him a question.

20            MR. DEELY:  No further questions,

21    Your Honor.

22            MR. WALTHER:  Nothing further, Your Honor.

23            THE COURT:  You may step down.

52

1            CORP. SLOVER:  Thank you, Your Honor.

2            (Corp. Slover excused.)

3            MR. WALTHER:  May I speak to counsel for

4    just a second?

5            THE COURT:  Yes.

6            (Counsel conferring.)

7            MR. WALTHER:  State calls Detective Daniel

8    Bramble.

9                ------

10            DET. DANIEL I. BRAMBLE, having been called

11    on the part and behalf of the State, having been duly

12    sworn according to law, was examined and testified as

13    follows:

14                ------

15            MR. DEELY:  Excuse us, Your Honor.

16            (Counsel conferring.)

17            MR. WALTHER:  We are not going to be able to

18    agree on this.  I intend to offer into evidence the

19    9-1-1 call and dispatch.  I believe it's relevant for

20    purposes with regard to this, not -- well, first of

21    all, it's relevant with regard to the issue of

22    reasonable and articulable suspicion, because it has

23    what's dispatched.  But in addition to that, it also

53

1   has the two individuals from 325 South Dupont Highway
2   who actually called in it, stayed on the line. And I
3   believe that is relevant to not only that they did
4   that, they called up a second time to establish that,
5   one, they're not anonymous callers, and this
6   continues between the anonymous caller and the one
7   citizen.
8          MR. DEELY: We will stipulate whether
9   they're anonymous, Your Honor.
10         MR. WALTHER: I'll make a record of this.
11  The difference between anonymous at this point and a
12  citizen who, technically, there's a crime being
13  committed on his property, criminal trespass, who
14  makes a call, and cooperating with the police, that
15  goes to credibility, reliability, which I believe is
16  an issue.
17         MR. DEELY: Your Honor, we will stipulate
18  that the call was not anonymous.
19         My problem with the playing of the 9-1-1
20  tape is the reasonableness of a stop-and-search
21  seizure is based upon the information that the
22  officer has at the time of such search and seizure,
23  not information that may be available at a later

54

1   date. Therefore, there's information on the tape
2   that may well go toward what the officer -- after the
3   fact, whether the officer had probable cause or
4   reasonable suspicion. But the fact of the matter is
5   that the officer has testified as to what he knew at
6   the time, and that's pertinent to the issue, what did
7   he know at the time that he made the stop and seizure
8   and conducted a search or didn't conduct a search,
9   not what evidence was found after the fact that may
10  buttress that. So, if somebody works on a hunch,
11  goes back and finds out a crime was committed, you
12  can't arrest people based on a hunch.
13         So my objection to the tape is not that it's
14  inaccurate or that it's anonymous. My objection to
15  the tape is, it gives far more information that the
16  officer didn't have at the time. And the officer now
17  testified as to what he knew at the time of the stop
18  and the arrest.
19         THE COURT: All right. Let me just make
20  sure that I'm clear on your position, though. You
21  are not intending to argue at any point in time that
22  the officer was not entitled to rely upon, without
23  equivocation, the information that he received from

55

1   RECOM, with respect to the observations that were
2   communicated from the residence of 325 South Dupont
3   on the basis that they were not anonymous, a
4   proven-reliable tipster from --
5          MR. DEELY: Name, address, all that
6   pertinent information, and we're available for
7   further investigation as to what he testified.
8          What I'm arguing here is that there's
9   information that was given to RECOM that, evidently,
10  was not given to the officer. And the officer has
11  stated what information he had and what information
12  that he used in order to make the stop and/or
13  seizure, and/or search and/or arrest.
14         The fact that there was more information
15  available that he didn't have is immaterial for
16  purposes of this hearing.
17         That's my argument, sir.
18         THE COURT: All right.
19         MR. WALTHER: It seems to me, Your Honor,
20  the State has the burden. And the State certainly
21  can present its case in a manner, one, that presents
22  its best case; and two, presents a picture to the
23  Court, Your Honor, since you're the fact finder in

56

1   this case with regard to the totality of the
2   circumstances surrounding the stop.
3          The tape is being offered for probable
4   cause. That is the information that Officer Slover
5   had in his possession, in his mind, plus any
6   reasonable inferences that he could draw from that,
7   including public-safety reasons. But in addition to
8   that, the State can also present it because, in the
9   best way possible, um, that the information is
10  reliable and credible on the issue. It clearly makes
11  a distinction between whether or not it's an
12  anonymous call, or a citizen complaint, a crime in
13  the progress. And I think that I should be permitted
14  to do that the best way I can. And the State
15  suggests that the best way to do that is actually
16  listen to the person making the call.
17         MR. DEELY: I don't mean to beat a dead
18  horse. I think it's exactly wrong. We have the
19  officer who conducted the stop and the arrest present
20  in court. It's what was in his mind at the time of
21  that stop and arrest, whether this is -- it was a
22  reasonable, probable cause or reasonable suspicion
23  existed. It's not what was on tape and told to RECOM

73

1  grounds to suspect a crime is committing, has
2  committed, or about to commit a crime. We can
3  concede based on the call that it may be reasonable
4  to think he may be involved with this group of
5  people, whoever it was based on, the time of night
6  and totality of the circumstances, but it goes
7  further to say that. And he may demand the person's
8  name, address, business abroad and destination. What
9  we have in this case is none of those things were
10  done by this officer, zero. He stopped him and
11  searched him.
12      Would it have been reasonable to say: "Who
13  are you?"
14      "Bryant Harris."
15      "Do you have identification?"
16      "Yes."
17      "Where are you headed, Mr. Harris?"
18      He could have said, "I'm on my way to
19  Pockets to have a drink."
20      There are lots of reasons why a pedestrian
21  may be in that area at that time of night. The area
22  didn't -- he never saw pedestrians walk. A person
23  could be walking to that commercial establishment.

74

1  The officer failed to follow 1902 is very specific.
2  1902 has been ruled in Delaware Supreme Court to be
3  the same as a Terry stop, but Delaware added
4  additional protections for the defendant.
5      In addition, Your Honor, the information
6  that the officer had at the time of the stop was that
7  there were multiple subjects. He only saw one. The
8  person was on the highway, not where they had said
9  that the subjects had left. The officer had a hunch
10  that there might be a weapon. But he certainly had
11  no articulable suspicion based on any actions by the
12  defendant or what the defendant was doing to suspect
13  anything. It was a cold, rainy, night -- correction,
14  it was a rainy night. The officer doesn't remember
15  what the weather was. It was damp and dreary. He
16  had a knit cap on his head. That's it. Beyond that,
17  once the client was in custody, once Mr. Harris was
18  in custody, the officer began an interrogation
19  without reading Miranda rights. The officer has all
20  control at that time. What was the purpose of
21  asking, do you have a weapon? He can search the
22  person and find the weapon if he has reasonable
23  articulable suspicion, and can point to identifiable

75

1  facts in that situation, that leads him, a reasonable
2  officer, to believe this person may be armed. The
3  specific person may be armed. It must be more than a
4  hunch. The officer testified, when he heard about a
5  pipe, he got a hunch it might -- he didn't use the
6  word hunch. He had a hunch it might be a shotgun.
7  That's a hunch. There's no actions. He didn't say
8  he saw the client limping as he was walking. He saw
9  him reach for a weapon. He saw him do no furtive
10  actions. He saw him do nothing but walking down the
11  street. He stopped him, didn't ask any questions.
12  He orders him to turn around and began a search.
13  That doesn't comport with either Terry or 1902, under
14  Delaware law. There was made a big deal about the
15  area, and it's a high-crime area. I haven't been in
16  a case where we didn't spend a lot of time on that.
17  Obviously, a high-crime area is purely subjective.
18  And the fact that it's a high-crime area, using that
19  logic, any person in the parking lot at Pockets could
20  be arrested and stopped if they got a call somebody
21  was doing something at Pockets parking lot or had
22  been. There's just no facts in this case, even
23  though the officer had a right to stop him, the

76

1  officer had a right to talk to him. The officer had
2  a reasonable suspicion at that point. He can't
3  conduct a search without going beyond that initial
4  reasonable suspicion. And Delaware codified that he
5  must ask him specific questions outlining what the
6  person is doing. As I said, he didn't give
7  Mr. Harris an opportunity to explain anything. He
8  sees him. He searched him. He questioned him
9  without reading him his rights, based on a hunch,
10  with no actions on Mr. Harris's part to indicate that
11  he may, in fact, be armed. And he wasn't in a group
12  of people, which is the only information that the
13  officer had at the time that he got the call.
14      MR. WALTHER: The defense seems to imply
15  that the fact that the officer did not have a
16  two-hour detention and have questions is fatal to the
17  issue of reasonable articulable suspicion. And it's
18  true that the -- that the State legislature has
19  codified it, but the Supreme Court of Delaware, in
20  Jones and Flonnery and subsequent cases, has said
21  that that Delaware two-hour detention statute, as
22  read in its entirety, means a reasonable and
23  articulable suspicion. So, I think, the argument

A-84

**77**

1  that he did not ask those questions is not fatal, as
2  long as there's a reasonable articulable suspicion
3  prior to the Terry type of patdown, nor is it fatal
4  to the State's case that before he patted him down,
5  he asked him if he had a weapon, and that is
6  uncontroverted. The defendant responded, yes, he did
7  have a weapon. He was patted down and the weapon was
8  found. I believe all those factors are sufficient
9  for a reasonable articulable suspicion, keeping in
10  mind that the burden the State has, keeping in mind
11  that reasonable articulable suspicion is less than
12  probable cause.
13      MR. DEELY: Your Honor, very briefly.
14      If the search is illegal for a weapon, Terry
15  is very specific; you must believe there's a weapon,
16  and you must have articulable facts to state that
17  there's a weapon. The officer stated none, except
18  that he had a hunch. Terry requires a specific fact
19  when he got the call. He heard about a pipe, thought
20  it might be a shotgun. Nothing, when he stopped the
21  individual, gave him any indication that the
22  individual was armed. He did not ask him any
23  questions. He didn't do anything else for the State

**78**

1  to attempt to bootstrap, after an illegal search or
2  an illegal search is being conducted, after an
3  illegal questioning is being conducted; to bootstrap
4  that as a consent to search just doesn't fly.
5      Thank you.
6      MR. WALTHER: What the defense calls a hunch
7  is what the State refers to as reasonable inferences
8  from objective facts based upon the training and
9  experience of the officer.
10      THE COURT: All right.
11      First, the Court reserved its decision with
12  respect to the tape that was marked as State's
13  Exhibit 2, so that I could hear the tape and
14  understand more fully what was on the tape and
15  understand the concerns addressed by defense counsel.
16      Before we began listening to the tape, the
17  defense acknowledged that this is not a tipster case,
18  or at least some willingness to stipulate to that; we
19  were not willing with an anonymous tip, and,
20  therefore, unreliable information.
21      I heard Mr. Walther just say, well, we
22  appreciate the stipulation, but we ought to be
23  allowed to demonstrate to you, with the evidence, we

**79**

1  have the reliability of the information that was
2  being communicated to RECOM and, in turn,
3  communicated to the officer. I am satisfied that
4  this is not a case that should be analyzed under the
5  anonymous-tip line of cases, that the information
6  received by RECOM was reliable information, ongoing
7  information, as events were unfolding. So I don't
8  believe that those cases are instructive.
9      Having said that, there are references in
10  the tape to descriptions of the individuals involved
11  that did not get communicated to Corporal Slover,
12  particularly the race of the individuals, and one
13  reference to black or dark clothing. That was not
14  communicated to Corporal Slover. And, therefore, the
15  Court is not going to consider that information in
16  the total mix of information available to Corporal
17  Slover that would have enabled him to form a
18  reasonable suspicion that a crime has been committed
19  or about to be committed. So that is my ruling with
20  respect to the admissibility of the tape. Part of it
21  is admissible, part of it is not, and the Court has
22  not considered that portion.
23      The standard of proof is preponderance of

**80**

1  the evidence. The State has the burden to carry that
2  standard of proof. And it's against that standard
3  the Court must weigh the evidence. There are two
4  steps. One is the initial approach, stop and
5  detention, if you will. The second is the search.
6  Counsel has referred to 1902. That certainly
7  addresses the Terry detention, or the Terry stop.
8      1903 is the state that addresses the
9  subsequent search that was done. I am not prepared
10  to rule, as a matter of law, that a 1903 search
11  cannot occur until the 1902 questions are asked. I
12  can envision any number of circumstances where that
13  would simply be unrealistic, given the dynamics of a
14  particular police encounter with a suspect. The
15  purpose of the Terry search, codified in 1903, is to
16  preserve the safety of the officer and any
17  individuals who may be in the area of the encounter,
18  and requiring officers to recite questions before
19  they search a suspect, in certain instances, is not a
20  reasonable requirement. The standard for both a stop
21  and a search is the same, and that is a reasonable
22  ground to suspect, or, in federal jurisprudence,
23  reasonable suspicion which, I believe, is the same

A-85

25

1     Q.   Uh-hmm.

2     A.   **Never walked to the store with Paul. I never**

3  **walked to Pockets with Paul.**

4     Q.   Okay. Where did you go when you got out of the

5  car?

6     A.   **Up the other end and around. I never touched**

7  **the highway until I was walking back.**

8     Q.   Okay. When you say "up the other end and

9  around," I'm going to refer you to State's Exhibit

10  No. 4, are you talking about going up this way? Towards

11  the back?

12     A.   **Yes.**

13     Q.   And the reason you went up that way is because

14  that's a secluded, dark area and you didn't want anybody

15  to see you, right?

16     A.   **Yes.**

17     Q.   And where did Dekelvin Townsend go?

18     A.   **All three of us walked together except for**

19  **Paul.**

20     Q.   All right. What route did Paul go?

21     A.   **Highway.**

22     Q.   All right. So he came up the highway, went in,

23  checked it out. You guys went this back way, okay?

26

1     A.   **Yes.**

2     Q.   And then at some point you come over to this

3  area over here on State's Exhibit No. 4, which appears

4  to be on the DuPont Highway side of Pockets, correct?

5     A.   **Yes.**

6     Q.   You're not out on the highway?

7     A.   **No, I'm not.**

8     Q.   Because you don't want anybody to see you,

9  right?

10     A.   **Right.**

11     Q.   I mean, you're about to commit a robbery,

12  right?

13     A.   **Yes.**

14     Q.   All right. And, now, the reason you wanted

15  Nocho to go in is because you wanted to know what was

16  going on in there before you went in, correct?

17     A.   **Yes.**

18     Q.   You wanted to know how many people were in

19  there, correct?

20     A.   **Yes.**

21     Q.   How many people were working there, correct?

22     A.   **Yes.**

23     Q.   All right. And he comes back, and apparently

27

1  you come from the back of Pockets, this area over here,

2  the grassy area with the trees, and you meet up with

3  him, right?

4     A.   **Yes, I was in the woods, not all the way in,**

5  **the end of the woods.**

6     Q.   All right. And he says to you there's some

7  people in there, right?

8     A.   **Two clerks.**

9     Q.   That's it, just two clerks?

10     A.   **That's it.**

11     Q.   That's -- I'm a little confused. All right?

12  You had already planned to commit a robbery with a

13  weapon, and you decided not to commit the robbery

14  because there were two clerks there?

15     A.   **No.**

16     Q.   Is that what you're saying?

17     A.   **I decided not to commit the robbery because we**

18  **all were endangering each other's lives and individuals**

19  **that would also be in there.**

20     Q.   Well, how is your life in danger when you have

21  a loaded shotgun?

22     A.   **How was my life in danger?**

23     Q.   You were the one with the gun, right?

28

1     A.   **Yeah.**

2     Q.   Well, they weren't armed? Your coconspirators

3  weren't armed, were they?

4     A.   **I was pretty -- I was putting them in danger as**

5  **well as myself.**

6     Q.   The only one you were putting in danger was

7  Marcus Comer, correct, your brother?

8     A.   **Everybody.**

9     Q.   All right. Well, they -- the plan wasn't for

10  Dekelvin Townsend and Paul Nocho to go into the store

11  with you, correct?

12     A.   **It was not.**

13     Q.   So, when Paul Nocho -- when you confront Paul

14  Nocho after he comes out and he tells you about there

15  being two clerks, all right, you, according to your

16  testimony today, decided, wow, this is dangerous, I

17  don't want my brother and these people to get hurt in

18  this robbery, right?

19     A.   **That and other thoughts that I had.**

20     Q.   All right. But one of you thought of public

21  safety, correct?

22     A.   **Public -- safety of myself and my brother and**

23  **friends.**

**29**

1  Q.  Did you care at all about the clerks?
2  A.  The clerks? That's why I didn't go in there.
3  Q.  All right. So let me see if I understand this,
4  the reason that you throw in the towel and decide not to
5  do this is because you were afraid that you, your
6  brother, your coconspirators, and possibly the clerks
7  could get hurt. Is that what you're saying today?
8  A.  That, and there's a better life than robbing
9  people. I thought about myself for once.
10  Q.  But in any event, okay, you decide that's it,
11  we're not going to do this robbery?
12  A.  Yes, sir.
13  Q.  Partially because you didn't want anybody to
14  get hurt, right?
15  A.  Because there's more things out there to do
16  than rob people. I have children.
17  Q.  Well, that's understandable.
18  A.  I don't want my kids to see me locked up in
19  jail from my stupidness that I did.
20  Q.  Can you explain that, if you're so concerned
21  about the safety -- your safety, all right, and the
22  future of your children and the safety of your
23  coconspirators and everything, why you in the first

**30**

1  place decided to take a loaded shotgun, put it down your
2  pants, and walk towards Pockets Liquor store with the
3  intent to commit an armed robbery?
4  A.  Sure. The moment all of us planned it, but in
5  the same token, all planned it, it was already in my
6  conscience not to do it. I just got out of jail
7  February, the last day of January of 2003 -- 2002,
8  excuse me.
9  Q.  So as you're hiding in the bushes and the trees
10  by Pockets, you have this epiphany, right, I'm going to
11  change my life, right?
12  A.  Yes.
13  Q.  And may I assume that when you had this
14  epiphany, you finally saw the light, all right, that
15  you're going to change your life. You took that shotgun
16  out of your pants, and you just threw it into the woods
17  and said, That's it. I'm never going to rob anybody
18  else again. That's what you did, right?
19  A.  I didn't throw a shotgun into the woods.
20  Q.  Oh, I thought you had this epiphany where you
21  were going to change your life?
22  A.  I'm not just going to throw the shotgun into
23  the woods. I'm going to take the shotgun back to the

**31**

1  house and tell my brother to take it back where he got
2  it from.
3  Q.  Well, you had an opportunity to get a deadly
4  weapon out of your hand, out of circulation, that could
5  never be used again in a robbery, all right, and you did
6  not take the opportunity to do that, correct?
7  A.  Why should I throw a loaded shotgun in the
8  woods so somebody else can find it and harm another
9  person?
10  Q.  And use it, right?
11  A.  Right.
12  Q.  Now, apparently when Paul Nocho meets you in
13  the grassy area south of Pockets, all right, you're the
14  one who calls it all off, correct?
15  A.  Yes, I did.
16  Q.  And did you get any argument at all from
17  anybody?
18  A.  No, I didn't.
19  Q.  Everybody followed your directions, according
20  to you, correct?
21  A.  Excuse me. Marcus said, Okay. That's what it
22  is.
23  Q.  And with did Dekelvin Townsend say?

**32**

1  A.  He didn't say nothing. He followed along -- he
2  followed Marcus across the highway.
3  Q.  Now, is it your testimony that all four of you
4  were there in the grassy area when you called it off?
5  A.  Paul Nocho was walking to the car. Myself,
6  Dekelvin, and Marcus Comer was behind the store in the
7  woods.
8  Q.  All right. Is it your testimony that when you
9  told Paul Nocho that it was off that the other two were
10  not around?
11  A.  I never told Paul anything. When he told me
12  there was two clerks in the store, he just kept on
13  walking.
14  Q.  Okay.
15  A.  Then I turnt to my brother and his friend and
16  told them what I told them.
17  Q.  Well, how far away from Paul Nocho were they
18  when you told them that?
19  A.  Paul was about 20, 30 feet away from me.
20  Q.  Walking back towards the getaway car?
21  A.  Yep. Yes.
22  Q.  Well, if it was all over, why didn't you tell
23  Paul Nocho?

33

1    A.   **Wasn't going to holler his name out.**

2    Q.   But you had an opportunity, you were right

3    there with him, right?

4    A.   **Sure, I was.**

5    Q.   Instead, you didn't tell him that the -- the

6    robbery was off, you let him walk back to the getaway

7    car, correct?

8    A.   **Yes, I did.  I wasn't going to be in a rush to**

9    **tell him because we didn't go -- none of us did go into**

10   **the store.**

11   Q.   But isn't it true that you made the decision

12   right there, all right, right here on State's Exhibit

13   No. 4, all right, where you met Paul Nocho?  All right.

14   You had this -- the light went off in your head, and you

15   decided that's it, we're not going to do it?

16   A.   **Right.**

17        MR. DEELY:  Your Honor, I believe this is --

18   this has been asked and answered.

19        MR. WALTHER:  Your Honor, it's foundation for

20   my next question.

21        THE COURT:  Overruled, a slightly different

22   question.

23   BY MR. WALTHER:

34

1    Q.   All right.  And at that very point, all right,

2    you let Paul Nocho, your coconspirator, walk away,

3    correct?

4    A.   **Yes, I did.**

5        MR. DEELY:  Your Honor, it's mischaracterizing

6    the testimony.

7        THE WITNESS:  Once --

8        THE COURT:  You have to wait.  Mr. Deely?

9        MR. DEELY:  Your Honor, Mr. Walther's

10   mischaracterizing the testimony.  The testimony was that

11   Nocho came up, said there were two clerks, and he

12   continued walking toward the car.  It was as he -- he

13   said he watched him walk away partway.  Then he turned

14   to the other two conspirators and made his statement.

15   That's not what Mr. Walther is saying.

16        THE COURT:  Mr. Walther, any response?

17        MR. WALTHER:  Your Honor, I'll just move on.

18        THE COURT:  Well, I do want you to address his

19   claim that you've misrepresented the testimony.

20        MR. WALTHER:  Well, my position is if I did, in

21   fact, misrepresent the testimony, he was there.  He

22   could correct me.

23        THE COURT:  Well, I'll just say the attorneys

35

1    shall, of course, use their best efforts to recite the

2    testimony as best that they can remember.  It will be my

3    final decision, final analysis, what the testimony

4    actually was.  You may continue.

5        MR. WALTHER:  Thank you, Your Honor.

6    BY MR. WALTHER:

7    Q.   Now, at any time when you were walking towards

8    Pockets with the intent to commit the crime of robbery

9    in the first degree, did you have the gun out?

10   A.   **No, I did not.**

11   Q.   I'm sorry?

12   A.   **No, I did not.**

13   Q.   You always kept it down in your pants?

14   A.   **Yes, I did.**

15   Q.   You never took it out?

16   A.   **No, I didn't.**

17   Q.   Even before you decided not to do it?

18   A.   **Never took it out.**

19   Q.   Now, it's your testimony that once you called

20   it all off, Dekelvin Townsend and Marcus Comer crossed

21   over the southbound lanes and the northbound lanes and

22   then walked towards Llangollen Boulevard, correct?

23   A.   **Yes.**

36

1    Q.   Now, how long after that did the police respond

2    and stop you?

3    A.   **Well, as I proceed walking, I'd said about four**

4    **minutes.**

5    Q.   About four minutes?

6    A.   **Yeah.**

7    Q.   All right.

8    A.   **I was walking slow.**

9    Q.   All right.  So it took you four minutes to walk

10   roughly from this area right here, which Slover

11   testified was about 150 feet, to the corner?

12   A.   **Yes.**

13   Q.   All right.  That's about right?

14   A.   **After I watched my brothers cross the street, I**

15   **didn't proceed walking -- once they got across the**

16   **street, that's when I started walking.  They had to wait**

17   **for traffic to cross.**

18   Q.   Well, you're standing here with a loaded

19   shotgun in your pants and a ski mask with the eyes cut

20   out?

21   A.   **Nobody could see the eyes.  It was rolled up**

22   **like a regular hat.**

23   Q.   Okay.  And you took the time to watch your

37

1  brother and Dekelvin Townsend cross over?

2      A.   Yes, I did.

3      Q.   And is that because you were concerned about

4  them getting hit by a car?

5      A.   It wasn't that. I wanted to wait until they

6  crossed the street.

7      Q.   Because you were concerned about their --

8      A.   I wanted to wait until they crossed the street.

9      Q.   Why?

10     A.   And then I started walking.

11     Q.   Why did you want to wait until they crossed the

12 street?

13     A.   Because that was my decision that I wanted to

14 make.

15     Q.   Why?

16     A.   That was my decision that I wanted to make.

17     Q.   Why?

18     A.   That was my decision that I wanted to make.

19     Q.   No particular reason, then, you just made that

20 decision?

21     A.   No, I just watched them walk across the street

22 and then proceeded to my destination.

23     Q.   Were you the least bit concerned that you'd be

38

1  walking southbound on a busy highway with a shotgun in

2  your pants?

3      A.   Nobody could see the shotgun.

4      Q.   Were you concerned at all that the police might

5  drive by and see you walking on the street without a

6  light, stop you, and find you with a shotgun?

7      A.   Pedestrians walk that way all the time.

8  There's a housing department over there.

9      Q.   So the answer is you weren't concerned about

10 that, correct?

11     A.   Yeah, I was concerned. I was on my way back to

12 the car.

13     Q.   It's your testimony it took you about four

14 minutes to walk about 100 feet?

15     A.   After I watched my brothers cross the street --

16 before they crossed, I watched the cars before, they

17 wouldn't get hit before that.

18     Q.   And that's when Police Officer Slover stopped

19 you, correct?

20     A.   Yes, he did.

21     Q.   Now, you heard him testify that at the time --

22 right before he stopped you, you were walking back

23 towards Pockets, correct?

39

1      A.   Yes, I did hear him say that.

2      Q.   And is it your position that he was wrong?

3      A.   Yes, he was.

4      Q.   Okay. You're not suggesting that he was lying

5  about that point, are you?

6      A.   He was telling false statements.

7      Q.   Then you were suggesting that he was lying,

8  right?

9      A.   Yes.

10     Q.   He wasn't simply wrong, he's a liar. Is that

11 what you're saying?

12          MR. DEELY: Objection, Your Honor.

13          THE COURT: On what grounds are you objecting?

14          MR. DEELY: It's attempting to characterize

15 what the witness is saying. The witness said what he

16 said. He said the statement was wrong. Now he's going

17 into characterizations of that statement. He doesn't

18 know why Corporal Slover said what he said. He just

19 knows what was said, and he disagrees with it.

20          THE COURT: Mr. Walther?

21          MR. WALTHER: No, he said he was lying, Your

22 Honor.

23          THE COURT: I will overrule the objection, and

40

1  I'll give the way the responses are phrased such weight

2  as I think appropriate.

3          MR. WALTHER: Thank you, Your Honor.

4  BY MR. WALTHER:

5      Q.   Would you agree with me, Mr. Harris, that of

6  everyone who has testified in this courtroom on the

7  issue of whether or not you were walking away from

8  Pockets or towards Pockets you have the most to lose as

9  a result of that?

10     A.   I was walking away.

11     Q.   That's not my question. My question was, with

12 regard to everyone who has testified on this issue, that

13 you, more than anyone else, have more to lose on the

14 issue of whether or not you were walking towards Pockets

15 or away from Pockets?

16     A.   Yes, I do have a lot to lose. I was walking

17 away from the area back to the car.

18     Q.   Now, when the police stopped you, all right,

19 you had already made this decision to end -- at least

20 according to you, to end the robbery, that's it, you're

21 not going to do it, correct?

22     A.   Yes.

23     Q.   Isn't it true that you knew that there were two

41

1  police cars right there?

2     A.  Well, when I was walking towards my direction

3  of the car, police car crept up behind me. And once it

4  got close to me and I seen the lights on the ground, I

5  turned around.

6     Q.  Okay.

7     A.  And once I turned around, another cop car came

8  up, asked me where I was going.

9     Q.  Okay. And you know at that point you have a

10  problem, right?

11    A.  I was sure I did.

12    Q.  Because you have something in your pants,

13  correct?

14    A.  Sure, I did.

15    Q.  The shotgun, correct?

16    A.  Yes, I did.

17    Q.  And knowing that you had already formulated the

18  intent to commit robbery in the first degree and having

19  a shotgun in your pants, all right, you didn't say to

20  the police officer, Here, take the gun, did you?

21    A.  No, I did not.

22    Q.  Now, it's your testimony here today that you

23  told Marcus Comer and Dekelvin Townsend that it was off,

42

1  correct?

2     A.  Yes, I did.

3     Q.  May I assume they're out there waiting to

4  testify to corroborate your testimony?

5     A.  Marcus Comer?

6     Q.  Yes.

7     A.  Yes.

8     Q.  He's out there, he's going to testify in this

9  case?

10    A.  If he's out there.

11    Q.  Okay. I'll wait.

12       MR. WALTHER: Nothing further.

13       THE COURT: Mr. Deely, redirect examination?

14             REDIRECT EXAMINATION

15  BY MR. DEELY:

16    Q.  Mr. Harris?

17    A.  Yes.

18    Q.  When you decided not to commit the robbery and

19  to go back to the car, did you know the police had been

20  called?

21    A.  No, I didn't.

22    Q.  Had you seen any police at that point?

23    A.  No, I had not.

43

1     Q.  When is the first time you saw the police?

2     A.  When I got to the intersection.

3     Q.  Is it the area where the two police cars are

4  marked on State's Exhibit 4?

5     A.  Yes.

6     Q.  That's the first time you saw the police?

7     A.  Yes.

8     Q.  And that was after you were headed back toward

9  the car?

10    A.  Yes.

11    Q.  Now, the State said you have the most to lose

12  in this -- in this case. That's kind of self-evident,

13  isn't it?

14    A.  Yes.

15    Q.  You're the one on trial?

16    A.  Yes.

17    Q.  So whatever the statements are, you have the

18  most to lose. Isn't that correct?

19    A.  Yes

20    Q.  You've also taken an oath today, haven't you?

21    A.  Yes.

22    Q.  And your oath is to tell the truth?

23    A.  Yes.

44

1     Q.  In the prior robberies which you admitted that

2  you had been convicted of prior -- previously?

3     A.  Yes.

4     Q.  Did you use any deadly weapons? Did you use

5  any guns?

6     A.  No, I did not.

7     Q.  Have you ever used a gun before?

8     A.  No, I did not. No, I haven't.

9        MR. DEELY: No further questions, Your Honor.

10       THE COURT: Mr. Walther?

11             CROSS-EXAMINATION

12  BY MR. WALTHER:

13    Q.  You were convicted on two separate occasions of

14  robbery in the first degree, correct?

15    A.  Yes, I have. Yes, I was.

16    Q.  And -- and that was on one indictment, correct?

17    A.  Yes.

18    Q.  I'm going to show you something. I'm going to

19  ask you if it refreshes your memory. In 1999 you pled

20  guilty to robbery in the first degree, and that was part

21  of an indictment where there were a number of other

22  charges, correct?

23    A.  Yes, it was.

45

1   Q.   Now, you see where it says robbery in the first
2   degree?
3   A.   Yes.
4   Q.   Do you see pled guilty?
5   A.   Yes.
6   Q.   PG? Do you see all those other charges?
7   A.   Yes.
8   Q.   All right. One of those other charges is
9   possession of a deadly weapon during the commission of a
10  felony, isn't it?
11  A.   Yes.
12  Q.   Is it your testimony today under oath, to tell
13  the truth, that during that robbery in 1999 you didn't
14  have a weapon on you?
15  A.   I did not.
16  Q.   Did a codefendant have a weapon?
17  A.   I didn't have no codefendant in there.
18  Q.   Now, in 2001 you pled guilty to yet another
19  robbery in the first degree, right?
20  A.   Yes.
21  Q.   And you recognize that charge of robbery first
22  degree, you pled guilty, right, on May 10th of 2001?
23  A.   Yes.

46

1   Q.   And isn't it true that it's all part of one
2   indictment?
3   A.   Yes.
4   Q.   And isn't it true that one of the counts of
5   that indictment was possession of a deadly weapon during
6   the commission of a felony, correct? Right under
7   Robbery I.
8   A.   Yes.
9   Q.   And may I assume that your testimony here today
10  is consistent with your prior testimony; even though you
11  were charged with that, you didn't have in your
12  possession a deadly weapon?
13  A.   I took a plea because I was scared.
14  Q.   That's not what I asked you.
15  A.   I never had a weapon.
16  Q.   It's your testimony today that you did not have
17  a weapon?
18  A.   Yes.
19  Q.   You're sure about that?
20  A.   Yes, I am.
21  Q.   You don't want to recant that statement at all?
22  A.   I never had a weapon in any of those robberies,
23  except the person in that case said that I had one.

47

1   Q.   All right. So at some point you had to stand
2   up in a court like this, all right, and admit that you
3   committed the crime of robbery in the first degree,
4   right?
5   A.   In the prior robberies that I had?
6   Q.   Yeah.
7   A.   No, I didn't. Oh, yes. I did. Yes, I did.
8   Q.   So you pled guilty to two robberies in an
9   indictment where there's two weapons counts, and a Judge
10  read to you the robbery in the first degree, correct?
11  A.   Yes, he did.
12  Q.   And isn't it true when he read to you the
13  statute of robbery in the first degree, he said you
14  displayed what appeared to be a deadly weapon?
15  A.   No, I don't remember --
16  Q.   Well, did you hurt somebody in those robberies?
17  A.   No, I did not.
18  Q.   Well, okay.
19      MR. WALTHER: Nothing further.
20      THE COURT: Mr. Deely, anything further?
21      MR. DEELY  No, the only thing I would say is
22  that the prior offenses were charged.
23      MR. WALTHER: Your Honor, excuse me. Is this

48

1   argument or is this a question?
2       MR. DEELY: I have a question. I have a
3   question.
4       THE COURT: All right. Then ask the question.
5              REDIRECT EXAMINATION
6   BY MR. DEELY:
7   Q.   In your prior robberies that the prosecutor
8   showed you the record of, the charges were carrying a
9   concealed deadly weapon. Is that correct?
10  A.   Yes, it was.
11  Q.   It didn't say a gun, did it?
12  A.   No, it did not.
13  Q.   You've never used a gun in any prior robbery,
14  have you?
15  A.   No, I haven't.
16      MR. DEELY: Nothing further, Your Honor.
17      THE COURT: Mr. Walther, anything further?
18      MR. WALTHER: No, Your Honor.
19      THE COURT: Then Mr. Harris may step down.
20  Will there be any further evidence from the defendant?
21      MR. DEELY: Nothing further, Your Honor.
22      THE COURT: Mr. Deely rests.
23      Will there be any rebuttal evidence from the

29

1    Q. I show you State's Exhibit No. 1. That's a
2  copy of the 911 call from Mr. Taylor?
3    A. Yes.
4    Q. Did you at some point in this investigation
5  talk to Mr. Taylor?
6    A. Yes, I did.
7    Q. Is he an African-American gentleman?
8    A. He is.
9    Q. Have attempts been made by you to locate him
10  for purposes of testimony here today?
11    A. Yes. In fact, I did find him at some point
12  several months ago. He was living in a vehicle.
13  But since then, I don't know his whereabouts.
14    MR. DEELY: Your Honor, we'll stipulate the
15  tape is authentic, and we've agreed it's admissible
16  under at least a couple of the hearsay exceptions.
17  The defense will stipulate to that.
18    THE COURT: Without objection, the tape will
19  come into evidence as the State's first exhibit.
20    MR. WALTHER: With the Court's permission,
21  I'd ask that Detective Bramble be able to play the
22  tape.
23    THE COURT: For my information, the

30

1  approximate length of the tape?
2    MR. WALTHER: Ten minutes, at most.
3    THE WITNESS: The tape needs to be rewound.
4    MR. WALTHER: Okay.
5    (Audiotape played for the Court.)
6    MR. WALTHER: Your Honor, the purpose of it
7  was for Your Honor to hear the 911 call. There is
8  some discussion back and forth between the
9  dispatcher and a number of police officers. If
10  Your Honor would like to listen to that, we can,
11  but --
12    THE COURT: I'll leave it to you,
13  Mr. Walther.
14    MR. WALTHER: Thank you, Your Honor.
15    MR. DEELY: We don't object to it being cut
16  off there, because it becomes essentially radio
17  gobbledegook that only the officers, I believe,
18  would understand.
19    MR. WALTHER: That's still part of the
20  record, for purpose of that exhibit, because it was
21  part of the suppression hearing.
22    THE COURT: The State elects not to play it,
23  so let's move on with the evidence.

31

1    MR. WALTHER: I have nothing further of this
2  witness.
3    THE COURT: Mr. Deely, you may
4  cross-examine.
5    MR. DEELY: I have no questions of this
6  witness.
7    THE COURT: Detective Bramble, you may step
8  down.
9    MR. WALTHER: The State calls Officer Scott
10  Slover.
11    OFFICER SCOTT SLOVER, having been called on
12  the part and behalf of the State as a witness,
13  being first duly sworn under oath, testified as
14  follows:
15    DIRECT EXAMINATION
16  BY MR. WALTHER:
17    Q. Officer Slover, by whom are you employed?
18    A. Delaware State Police.
19    Q. As a trooper?
20    A. Yes.
21    Q. And how long have you been a trooper?
22    A. Going on six years now.
23    Q. Were you a trooper for the Delaware State

32

1  Police back on May 7, 2003?
2    A. Yes.
3    Q. On that date, did you have occasion to
4  respond to the area of 325 South DuPont Highway?
5    A. Yes.
6    Q. And do you recall approximately what time
7  you were dispatched?
8    A. Approximately 2338 hours, 11:38 at night.
9    Q. And how long did it take you to get to the
10  area of 325 South DuPont Highway?
11    A. Approximately five minutes.
12    Q. When you were dispatched to that location,
13  what information, if any, did you have in regard to
14  why you were going to that location?
15    A. I was responding there because 325 South
16  DuPont Highway is a residence, and the occupants of
17  that residence called 911 because they reported
18  that there was a vehicle parked in their driveway
19  and subjects had exited the vehicle and placed
20  masks over their face.
21    MR. DEELY: Your Honor, the officer is now
22  engaging in hearsay. We've heard the tape. If he
23  can just say why he was dispatched, then what he

33

35

1   did.

1   A. Yes.

2       THE COURT: That's, in essence, what he's

2   Q. Did you see other police vehicles there?

3   doing.

3   A. Yes.

4       Mr. Walther.

4   Q. Were these also marked police vehicles with

5       MR. WALTHER: It's not hearsay, Your Honor,

5   lights?

6   because it's not offered for the truth or veracity,

6   A. Yes.

7   but to tell you why he went to that location, to

7   Q. Did you see whether or not they had their

8   give Your Honor some flavor.

8   lights on the top of their car on?

9       THE COURT: Objection overruled. I don't

9   A. At the same time I activated my lights,

10  think it's hearsay.

10  there was another trooper directly in front of me.

11      A. The subjects had placed masks on their face.

11  Q. And what officer was that?

12  One subject had put something that appeared to be a

12  A. Trooper McLaughlin, Delaware State Police.

13  pipe inside their clothing and walked northbound

13  Q. Was there a time when you saw Officer

14  toward Pockets.

14  Fletcher respond?

15      THE COURT: Is that something that you

15  A. Yes.

16  observed or were told?

16  Q. Did he respond to the police vehicle with

17      THE WITNESS: That's something I was told by

17  the lights on?

18  the dispatchers.

18  A. I don't recall when he had his lights on,

19  BY MR. WALTHER:

19  but yes, he did respond in a police vehicle.

20  Q. With that information, did you respond to

20  Q. Do you recall at some point whether or not

21  the area of 325 South DuPont Highway?

21  you saw the lights in his car on?

22  A. Yes, sir.

22  A. Yes.

23  Q. When you came to that location, can you

23  Q. Was that after you apprehended somebody on

34

36

1   describe the police vehicle that you were driving?

1   South DuPont Highway?

2   A. I was driving a fully marked Crown Victoria,

2   A. Yes.

3   lights on top, Delaware State Police emblems on the

3   Q. Can you tell the Court, please, what you did

4   side.

4   as you approached 325 South DuPont?

5   Q. When you're saying lights on top, you're

5   A. Yes. As I was coming on 13 southbound, as I

6   talking about 360's?

6   explained a moment ago, Trooper McLaughlin was

7   A. Yes, bar on top, red and blue lights.

7   directly in front of me. As we approached the red

8   Q. When you were dispatched there and went to

8   light at Llangollen Boulevard, we were just north

9   that location, was there a time when you put 360's

9   of the red light itself, again, 13 southbound, I

10  on, the police lights?

10  noticed Trooper McLaughlin was in the right lane.

11  A. Yes.

11  Like I said, I was directly behind him.

12  Q. And did there come a time that you stopped

12      He came to a stop, and I noticed a subject

13  someone on DuPont Highway?

13  walking northbound on the right shoulder of 13

14  A. Yes.

14  southbound, so walking against traffic. He was

15  Q. When did you put the lights on in

15  only about --

16  relationship to stopping this vehicle?

16  Q. Go ahead.

17  A. Immediately when I noticed the subject, so

17  A. He was only about a foot to the right of the

18  right just north of the intersection of 13 and

18  solid right line which separates the right lane

19  Llangollen, on the right shoulder of 13 southbound.

19  from the shoulder, and he was walking northbound

20  Q. Was the police vehicle still moving when you

20  towards Pockets.

21  did that?

21  Q. So he was walking northbound on the shoulder

22  A. I believe it was, as I was coming to a stop.

22  of the southbound lane?

23  Q. Did other officers respond?

23  A. Correct.

37

39

1    Q. Can you describe the shoulder?

2    A. It's a low asphalt shoulder approximately

3    12-foot wide.

4    Q. And what did you do?

5    A. As I said, Trooper McLaughlin stopped in the

6    right lane, and that's when I noticed the subject

7    standing or walking northbound on the shoulder. I

8    pulled my vehicle to the right of Trooper

9    McLaughlin's, so I was actually sitting in the

10    right shoulder. And at that time, I had my lights

11    on and whatnot.

12    Q. So right before you stopped him, he was

13    walking towards Pockets Liquors?

14    A. Correct.

15    Q. What did you do as you stopped him?

16    A. I stopped him. As I said, Trooper

17    McLaughlin's car was in the right lane. Mine was

18    on the right shoulder.

19    The subject was wearing blue coveralls and a

20    dark knit cap on his head. And I exited the

21    vehicle and asked him to remove his hands from his

22    pockets because he had his hands in his pockets at

23    the time. And I asked him to turn around because

38

1    at this time, he was facing me. And at this time,

2    I was going to complete a patdown on the subject.

3    Q. For what purpose?

4    A. Because while I was traveling there, I'm

5    taking all the Recom from the dispatch -- what

6    Recom had stated on the radio as far as the subject

7    exited the vehicle, placed a mask over their face,

8    put what appeared to be a pipe inside their

9    clothing, and were walking toward Pockets, so I

10    took that into consideration.

11    I saw this subject on the shoulder. He had

12    a knit cap on. It wasn't pulled over his face, but

13    he had a knit cap on his head, he had dark clothing

14    on. So I exited the vehicle and wanted to pat him

15    down, because the large pipe could have possibly

16    been a weapon, could have been, you know, a

17    shotgun.

18    Q. Okay. Did you search him?

19    A. As I went to place my hands -- I didn't

20    actually put my hands on him yet. I had my left

21    hand toward his back and my right hand was out like

22    this, and I stated, Do you have any weapons on you?

23    which I always state to anybody I'm going to pat

1    down, before I even touched him. He said he had a

2    shotgun on him.

3    Q. Did you search him then?

4    A. Yes.

5    Q. What did you find?

6    A. Found a 12-gauge shotgun inside his blue

7    coveralls that he was wearing.

8    Q. Did you remove it?

9    A. Yes, I did.

10    Q. Did you check to see if it was loaded?

11    A. Yes, it was. There was one round of Federal

12    7-1/2-shot shotgun shell in the chamber.

13    Q. Was the safety off?

14    A. The safety was off, and there was also one

15    in the magazine underneath, same round.

16    MR. WALTHER: Your Honor, may I have this

17    marked for identification, please?

18    THE COURT: Yes.

19    MR. WALTHER: Your Honor, by the way, I

20    brought this in and had Detective Bramble make sure

21    it was not loaded and it's not operable.

22    MR. DEELY: Without objection, Your Honor.

23    MR. WALTHER: I'll ask that it be marked as

40

1    an exhibit.

2    THE COURT: Mark it as the next State's

3    Exhibit, please.

4    THE CLERK: State's Exhibit 2, Your Honor.

5    (State's Exhibit No. 2 was admitted into

6    evidence.)

7    BY MR. WALTHER:

8    Q. Officer Slover, I show you what has been

9    marked as State's Exhibit No. 2.

10    Is this the shotgun that you removed from

11    the man that you stopped on May 7, 2003 by Pockets

12    Liquor Store?

13    A. Yes, it is.

14    Q. Does it appear to be in essentially the same

15    condition as it was when you stopped that

16    individual?

17    A. Yes, it was.

18    Q. Is that individual that you stopped in the

19    courtroom today?

20    A. Yes, he is.

21    Q. Would you identify him, please?

22    A. Sure. Mr. Harris, seated to the right of

23    Mr. Deely.

53

1  The testimony is this: That when Officer
2  Slover pulled up within 20 feet of him, the defendant
3  was walking towards Officer Slover, which is in a
4  northbound direction towards Pockets, and we're not
5  talking about it being two or three blocks away, Your
6  Honor. I believe the testimony was that it was 140 feet
7  from the top of the intersection there at Llangollen
8  Boulevard to Pockets. And, you know, we're only talking
9  about less than 40 yards from that area.
10  THE COURT: What did Corporal Slover testify to
11  in terms of, if he testified this way, the number of
12  steps that the defendant was observed walking
13  northbound, north -- north on the southbound shoulder?
14  MR. WALTHER: I don't know --
15  THE COURT: I don't know that he did. I'm
16  trying to get a sense --
17  MR. WALTHER: He qualified it. I'm sorry, Your
18  Honor.
19  THE COURT: Is it possible, from a fair
20  reading, his testimony was, well, maybe the defendant
21  was walking southbound along with traffic, but then
22  turned around and briefly started to walk -- see, what
23  I'm getting at? I'm just trying to see if Corporal

54

1  Slover's testimony indicates just how long and how
2  established the northbound route was.
3  MR. WALTHER: Your Honor, we did not get into
4  that much detail. However, his testimony I -- in which
5  he was asked a number of times was that he was
6  walking -- his testimony was not that he saw him, he
7  stopped, and then he turned around. In fact, the only
8  testimony with regard to any turning around is when the
9  officer for public -- for his own safety instructed him
10  to turn around.
11  THE COURT: Yes, I believe the officer
12  testified to that about three times, at least.
13  MR. WALTHER: At least. And, you know, I think
14  Your Honor knows exactly where the case turns on. The
15  case turns on whether or not he was walking towards
16  Pockets or that he renunciated and was walking away from
17  Pockets. And it all -- it will come down to who does
18  Your Honor believe. The State suggests that given the
19  circumstances of the defendant's background, given the
20  fact that he has so much to gain in his testimony,
21  and --
22  THE COURT: Now, the only -- the only way in
23  which I'm considering the prior robbery convictions is

55

1  under Rule 609, in so far as credibility is concerned.
2  The State's not introduced any 404(b)-type evidence.
3  MR. WALTHER: Absolutely, Your Honor. And it
4  was for that purpose, because it's a crime of
5  dishonesty, robbery in the first degree.
6  THE COURT: Now, if I may interrupt again then?
7  Wouldn't it also be possible, and maybe I should be
8  asking this to Mr. Deely later, but wouldn't it also be
9  possible that the defendant was walking away from
10  Pockets, but still hadn't renounced or abandoned the
11  crime anyway?
12  MR. WALTHER: Absolutely, Your Honor. And if
13  you --
14  THE COURT: So I don't think the direction of
15  the walker, the defendant, is absolutely determined
16  necessarily one way or the other.
17  MR. WALTHER: But it's a significant factor.
18  All right? But the other thing, too, is it doesn't
19  really make sense if, as I've described it, this
20  epiphany that the defendant has right after Paul Nocho
21  tells him who's inside that he wouldn't say to Paul
22  Nocho, Hey, you know, that's it. But what does he do?
23  All right. He just has him go back to the car and wait

56

1  there, placing him in jeopardy as a -- as the driver of
2  a getaway car. It just doesn't make sense he would do
3  that, especially with his background.
4  The issue comes down to, you know, whether or
5  not there was a renunciation that is a voluntary and
6  complete renunciation as that term is used. And
7  Subsection C(1) of Section 541 says when it's not a
8  voluntary and complete renunciation, it neither in whole
9  nor in part, if there is a belief that circumstances
10  exist which increase the probability of detection or
11  apprehension of the accused or another participant. The
12  State suggests that given all the circumstances and
13  given the defendant's uncorroborated testimony, even
14  uncorroborated by his own brother and even
15  uncorroborated by one of his own coconspirators, he says
16  it was a complete and voluntary renunciation.
17  The bottom line, Your Honor, is reason and
18  common sense dictates, all right, that he sees the
19  police coming. That when he sees the police coming, he
20  realizes that he's caught. He did nothing up to that
21  point. If he really was fed up with the life that he
22  had, he could have tossed the gun. He could have told
23  the police, Hey, all right. Here's the gun. Take it.

13

1    THE COURT: Walther, you may cross-examine.
2    MR. WALTHER: Thank you, Your Honor.
3              CROSS-EXAMINATION
4  BY MR. WALTHER:
5    Q.  It is a fact that when you and Marcus Comer,
6  and Marcus Comer being your brother, before the robbery,
7  that you had a discussion with your coconspirators that
8  you were going to rob Pockets Liquors, correct?
9    A.  Yes.
10   Q.  In fact, it was your idea; you're the one with
11 the expertise, correct?
12   A.  No, it was everybody's idea.  Wasn't
13 particularly my idea.
14   Q.  Well, everyone agreed, correct?
15   A.  Yes.
16   Q.  All right.  And are you saying that it was
17 someone else's idea, not your idea, to commit a robbery
18 that night?
19   A.  Not saying that it was -- repeat the question
20 again.
21   Q.  Was it your idea to commit the robbery?
22   A.  No, it was not.
23   Q.  Whose idea was it?

14

1    A.  I'm not sure whose idea was it, but I blended
2  in with the conversation.
3    Q.  All right.  So discussions took place before
4  you even left the house that you were going to do a
5  robbery with these other individuals, correct?
6    A.  Yes.
7    Q.  May I assume, then, you had a discussion about
8  how the robbery was going to occur, right?
9    A.  Yes.
10   Q.  In fact, isn't it true that you decided who was
11 going to do what?
12   A.  Yes.
13   Q.  In fact, you decided that Comer was going to be
14 the driver of the getaway car, right?
15   A.  Comer?
16   Q.  Excuse me.  Nocho?
17   A.  Yes.
18   Q.  Right.  And you decided that you and Marcus
19 Comer would go in and actually commit the robbery,
20 correct?
21   A.  Yes.
22   Q.  And you decided that Dekeivin Townsend would be
23 the lookout, correct?

15

1    A.  Yes.
2    Q.  Isn't it fair you were calling the shots that
3  evening?
4    A.  Everybody agreed.  I wasn't calling the shots.
5    Q.  When you told them what their roles were, they
6  agreed, correct?
7    A.  Yes.
8    Q.  Now, before you left, did you make any attempt
9  to get any type of a disguise?
10   A.  Yes, we did.
11   Q.  You said yes, we did or yes, you did?
12   A.  Yes, we did.
13   Q.  All right.  So everybody did.  Whose idea was
14 it to get a disguise?
15   A.  It wasn't nobody -- wasn't no particular
16 person's idea.  Everybody assumed to get a disguise.
17   Q.  Are you just saying that it seemed like a
18 reasonable thing to do, if you're going to commit a
19 robbery, that you have some type of disguise?
20   A.  Yes.
21   Q.  And because you didn't want to be apprehended,
22 correct?
23   A.  Yes.

16

1    Q.  And if somebody could see you with your face
2  exposed, you could be identified and convicted of
3  robbery again, right?
4    A.  Yes.
5    Q.  You knew that before you even left the house,
6  right?
7    A.  Yes.
8    Q.  So you decided to get a knit cap, correct?
9    A.  Yes.
10   Q.  And you decided to cut the holes out, correct?
11   A.  Yes, I did.
12   Q.  And you already decided that you were going to
13 use a weapon during that robbery, correct?
14   A.  Once -- once I was told there was going to be
15 one, yes.
16   Q.  Once you were told there was going to be one?
17   A.  Yes.
18   Q.  I thought you were the guy telling everybody
19 what they were going to do?
20   A.  Yes, but somebody presented a weapon to me.  I
21 didn't know that they had a weapon.
22   Q.  Oh.  All right.  So somebody gave you a weapon?
23   A.  Yes.

## TABLE OF CONTENTS

Page

STATEMENT OF CHARGES  . . . . . . . . . . . . . . . . . .  1

NATURE OF DEFENSE AT TRIAL  . . . . . . . . . . . . . . .  3

SUMMARY OF THE EVIDENCE  . . . . . . . . . . . . . . . .  4

SIGNIFICANT APPLICATIONS AND RULINGS  . . . . . . . . . . 11

POINTS THE APPELLANT WISHES THE COURT TO CONSIDER  . . . 13

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . 14

## STATEMENT OF CHARGES

Ryant N. Harris was charged by indictment and tried for Attempted Robbery First Degree, Possession of a Firearm During the Commission of a Felony, Conspiracy Second Degree. The following charges were Nolle Prossed prior to the commencement of the trial: Attempted Robbery First Degree, Possession of a Firearm During the Commission of a Felony, Wearing a Disguise During the Commission of a Felony, Carrying a Concealed Deadly Weapon, and Possession of a Firearm by a Person Prohibited. These charges were dropped in exchange for Harris' waiver of a jury trial.

The Attempted Robbery First Degree charge alleged that Mr. Harris attempted to commit a Robbery against Sunilkumar Patel an employee of Pockets Liquor Store. Mr. Harris and his co-defendants planned the robbery at a co-defendants house and they then traveled to the vicinity of Pockets Liquor Store. They then place ski masks over their heads and took a shotgun which they intended to use in the Robbery. These acts in there entirety, constituted a substantial step in a course of conduct planned to culminate in Robbery First Degree. The Possession of a Firearm During the Commission of a Felony charge alleged that Mr. Harris and his co-defendants did possess a firearm during the

1

commission of Attempted Robbery First Degree. The Conspiracy

Second Degree alleged that Mr. Harris and his co-defendants

on or about the 7th of May, 2003, when intending to commit

Robbery First Degree or a related felony, did agree with one

another to engage in a course of conduct constituting

Robbery First Degree and further that an overt act was

committed in pursuance of said Conspiracy.

2

## NATURE OF DEFENSE AT TRIAL

The defense at trial was the defense of renunciation. The argument was that Mr. Harris' actions manifested a voluntary and complete renunciation of the criminal purpose under 11 Del. C. § 541 (a)(b).

## SUMMARY OF THE EVIDENCE

Prior to trial a suppression hearing seeking to exclude the shotgun was held. The Court ruled that the State Trooper that frisked Mr. Harris had an articulable reasonable suspicion for the weapons search.

On May 7, 2003, Delaware State Troopers arrested Mr. Harris and two of the three co-defendants in the vicinity of Pockets Liquor Store. The fourth co-defendant was arrested sometime later as a result of information obtained during the investigation. A New Castle Grand Jury indicted all four individuals. All of the co-defendants except Mr. Harris accepted the plea offers made by the State. Mr. Harris rejected the State's offer. Mr. Harris waived his right to a jury trial and the case against Mr. Harris proceeded to trial in the Superior Court before the Honorable Richard R. Cooch on February 19, 2004. Mr. Harris was convicted of the three counts for which he was tried. Mr. Harris received a sentence of eleven (11) years at Level 5 suspended after ten (10) years for probation. After a timely Notice of Appeal was filed, briefing was scheduled and this is the Appellant's brief on appeal.

The trial began on February 19, 2004. Mr. Harris waived his right to a jury trial. (A-12,13). In exchange for the

4

waiver the State agreed to drop counts III, IV and V. (A-12). The prosecutor gave his opening statement to the Court. (A-14-16). Defense Counsel then gave his opening statement. (A-16-17). He claimed that the evidence would show that Mr. Harris and the three co-defendants were at Mr. Harris' house. (A-16). While there they decided to commit a robbery. (A-16). They got into a co-defendant's car and drove 325 DuPont. (A-16). They parked the car at that address. (A-16). They got out of the car and Mr. Harris placed the shotgun inside his coveralls. (A-16). He and the other co-defendants put their masks on and walked across the street to the wooded vacant lot towards the liquor store. (A-16). Mr. Harris never in fact went into the store and that when the police arrived Mr. Harris was walking away from the liquor store. (A-16). When stopped he was about fifty feet from the car. (A-16). That at least three of the co-defendants were walking away from the scene prior to the arrival of the police with out knowing that a 911 call was made. (A-16). Therefore, since they were leaving the scene prior to the arrival of the police and before they had knowledge that the police were called, they had in fact renounced their plan to rob Pockets Liquor Store. (A-16,17). The Defense stipulated that Pockets was a liquor

5

store. (A-17). That it was open and a cash business. (A-
17). The Defense further stipulated that the store was open
and that there were people on duty in the store. (A-17).

The State called Detective Bramble as its first
witness. (A-17). He authenticated the 911 tape. (A-17).
The Defense stipulated to the authenticity of the tape and
agreed to the tape being played. (A-18).

The State then called Officer Slover of the Delaware
State Police. (A-18). He testified that he responded to the
area of 325 DuPont Highway. (A-18). He stated that upon
being dispatched he was informed that the subjects had put
on masks and one put what appeared to be a pipe in his
pants. (A-19). Upon arriving in the area he noticed a
Harris just north of the intersection of Route 13 and
Llangollen on the right shoulder. (A-19). Harris was
walking northbound towards Pockets. (A-19). When the
officer stopped Harris he was wearing coveralls and a dark
knit cap. (A-20). The officer asked him to remove his hands
from his pockets and turn around. (A-20). Prior to patting
Harris down the officer asked if he had any weapons to which
Harris responded that he had a shotgun. (A-20). As the
officer had Harris stopped he saw a vehicle attempting to
leave 325 South DuPont Highway and he asked Corporal

6

Fletcher to stop the car. (A-21). The area where Harris was stopped was a dark area illuminated only by the traffic light. (A-24). It was raining. (A-24). Harris was stopped approximately 150 to 200 feet from Pockets. (A-23,25).

The State next called Officer Fletcher. (A-31). Officer Fletcher stopped the car and driver, Paul Nocho, attempting to leave 325 South DuPont Highway. (A-31). The officer also testified that he heard a radio call that a county officer stopped another individual across Route 13 from where Harris was stopped. (A-32).

The State next called Paul Nocho. (A-33). Nocho confirmed that Harris and the three co-defendants were together at the house. (A-33). He confirmed that they planned the robbery while at the house and then left in the car with disguises and the shotgun. (A-34). He confirmed that he drove the four of them to the house near Pockets. (A-34,35). He stated that his role was to go into the store to case it and then be the get away driver. (A-35). He went into the store and on his way back to the car he talked with Harris and told him there were people in the store. (A-35,36). He did not see the other two co-defendants while returning to the car. (A-36) He stated that as part of his plea agreement he would testify at the co-defendants'

7

trials. (A-36,37). On cross he testified that the location where Harris was stopped was farther away from Pockets than the point where he talked to Harris after casing the store. (A-38). He further stated that Harris would have to walk away from Pockets to get to the point where he was stopped by the police. (A-38).

The State rested. (A-41).

The defense then called Mr. Harris. (A-41). Harris testified that as Nocho walked back to the car, Harris decided that the robbery was a mistake. (A-42). He told the other two co-defendants, Comer and Townsend, "It's not going to happen." (A-42). He told them to walk home and meet him at the house. (A-42). Then Harris waited until the two co-defendants crossed Route 13, and then he began to walk back to the car. (A-43). Harris stated that when the police stopped him he was getting ready to go around the corner back to the car. (A-43). He further stated that Corporal Slover was wrong when he stated that Harris was walking towards Pockets when he stopped Harris. (A-50). He said he turned around from the direction he was walking when he noticed the car behind him. (A-50,51). The rest of Harris' testimony was in general agreement with the facts previously outlined.

8

The closing arguments restated the prosecution arguing that Harris was walking toward Pockets and that the person mentioned as coming back on the 911 tape could easily have been one of the co-defendants. The Court said it was only considering Harris' prior record as to credibility. (A-54). The Court asked why the other co-defendants were not in the area and the State argued that they left upon seeing the police. (A-55). The State argues that the person mentioned in the 911 call could be a co-defendant. (A-55) The Court asked why was Harris farther away from Pockets when stopped by the police then when he talked to Nocho. (A-55). The State responded that he need to meet with the other two co-defendants to complete the robbery. (A-55). The defense argued that Harris was walking away from Pockets before ever seeing the police and that the person mentioned on the 911 tape as coming back could only be Harris. (A-56). The defense argued that the renunciation occurred when Harris said he could not go through with the robbery and told the co-defendants to go home. (A-56). The defense then discussed the renunciation. (A-56,57). The Court then asked what analysis applied to the possession of a deadly weapon count. (A-57). The defense responded that the firearm charge was directly linked to the felony and if renunciation

9

was found the charge would fail. (A-57).

The Court then made its finding. The Court began by reciting some of the facts and discussing the defense of renunciation. (A-58-60). The Court further found that based on its assessment of the credibility of the witnesses and the evidence presented the defense of renunciation was not established by a preponderance of the evidence. (A-61). The Court further found that irrespective of the defense raised it found beyond a reasonable doubt that all of the charged offenses were committed. (A-61). A presentence investigation was ordered. (A-61).

## SIGNIFICANT APPLICATIONS AND RULINGS

The only unfavorable ruling impacting the defense was the Court's ruling denying the suppression of the shotgun evidence.

11

SENTENCE

The Defendant was sentenced April 23, 2004. His sentence for the Attempted Robbery First Degree was that effective May 7, 2003, he was sentenced to four years at Level V. On the count of Possession of a Firearm During the Commission of a Felony he is to be imprisoned for eight years at Level V, consecutive to the forgoing, suspended after serving six years at Level V, for two years at Level IV, home confinement. The Defendant is to be held at Level V until space is available at Level IV. Level IV home confinement is suspended after six months for the balance to be served at Level III. The first five years of the sentence is a mandatory term of incarceration. On the count of Conspiracy Second Degree he was sentenced to one year Level 5 suspended immediately for one year of Level II concurrent probation.