# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LYNN HARRIS
     Petitioner,

   v.

THOMAS CARROLL

"APPENDIX TO PETITIONER'S WRIT
OF HABEAS ORPUS"

NO# 0305005293
Appeal NO# 193



0 6 - 7 8 6

FILED

DEC 21 2006

DISTRICT COURT
DISTRICT OF DELAWARE

LYNN HARRIS, PROSE
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

Dated: _12-18-2006_

## Table of Contents

### "EXHIBITS"

### EXHIBIT – A

September 22, 2006 Court Order 1 thru 4

### EXHAUSTED CLAIMS

Argument - #1 "Exhibit, - B"
Whether the police had reasonable and articulable suspicion for an investigatory stop of the defendant violated his U.S.C.A Amend 4, Del. C Annotated Const, Article 1 thru 6 of title 11 Del, C 1402.

### Argument - #2 EXHIBIT, C

Whether the state failed to prove their case beyond a reasonable doubt under the corpus delicti rule to support the conviction for attempted robbery, 1st degree with a deadly weapon charge in their in chief deprived the appellant to a fair trial under the 5th amendment plus denial of his due process rights under the 14th amendment.

### Argument #3 Exhibit, D

Whether the defendant 5th Amendment rights were violated by police when failed to administer defendant Miranda warning at time he was arrested and taken into custody.

### Argument #4 Exhibit – E

Whether counsel was ineffective when he failed to file timely notice of appeal, which is his continued obligation pursuant to Supreme Court rule 26'A' in violation of his 6th Amend plus 14th due process rights.

Whether the police had reasonable and Articulable suspician for an investigatory stop of the defendant violated his U.S.C.A. Amend 4, Del. C. Annotated Const Article 1 – 6 of title 11, Del C. 1402.

### Standard Scope of Review

The standard scope of review is whether the police had reasonable and articulable suspicion an investigatory stop of the defendant.

### Argument

We recognize that police on patrol perform a variety of functions. Thus, a police officer, in carrying out his duties may stop and speak to an individual on the street without necessarily implicating the individual rights. We acknowledge, furthermore, that the police must enjoy a degree of latitude in making investigative stops. Nevertheless, the requirement of a reasonable and articulable factual basis for an investigative stop must be met.

We have consistently stated that a police officers decision to detain an individual for investigate purpose must be predicated or more than a mere hunch. See officer Slover's testimony he had a hunch, and that he got a hunch it might be-he use the word hunch, he had a hunch it might be a shotgun. (see transcript of suppression hearing pg. 74 thru 75).  *Lynn Haires*

2

We are persuaded that informational basis advanced by the officer to justify his stop of the defendant, which the officer himself characterized as a hunch was insufficient. Citing Jones v State No. 115,1998,745 A2d 856, June 22nd, 1994 Dec. 16th 1994 revered. In title 11 del-C Annotated Subsection 1902 reads in pertinent part that questioning and detaining suspect's.

A police officer may stop any person aboard or in a public place who the officer has reasonable grounds to suspect is committing, has committed or is about to commit a crime, and demand the persons name, address, business aboard and destination.

The total period of detention provided for by this section shall not exceed two hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime.

Any person so questioned who fails to give identification or explain the persons action to the satisfaction of the officer may be detained and further question and investigated.

The thrust of this section is that the detention is authorized if a person fails to adequately give identification or, in a limited way, explain the person action.

The defendant charged in the indictment for attempted robbery first degree plus possession of a firearm during the commission of a felony plus conspiracy second degree in which he was found guilty. The thrust of this proceeding is whether officer Slover executed property during the investigatory stop was in violation and have articulable suspicion and reasonable fact's to warrant such a stop. During the course of the proceeding Officer Slover testified that he was responding to the occupants of the residence of 325 S. DuPont Hwy to their 911 call because, the reported was a vehicle parked in their driveway and subject's had exited the vehicle and placed mask over their face. (See transcript of trial pg 32).

Objection: Mr. Deely your honor, the officer is now engaging in hearsay we've heard the tape. If he can just say why he was dispatched, then what he did.

The court: That's in Essence, what he's doing pros: Mr. Walther: It's no hearsay, your honor because it's no offered for the truth or veracity, but to tell you why he went to the location to give your honor some favor.

The court: objection overruled. I don't think it's hearsay. The subject had placed masks on their face. One subject had put something that appeared to be a pipe inside their clothing and walked northbound toward pockets.

The court: It's something that you observed or were told.

The witness: That's something I was told by the dispatchers (page 33 of trial transcript).

In citing Jones v State 745 A 28 856 The Court stated that it would have been relatively easy for the dispatcher to solicit some minimal articulable fact's from the anonymous informant to support the bare assertion that the vehicle was suspicious  FN 71 at 462. Since the officer observed no corroborative criminal behavior the court found that the stop was not supported be reasonable suspicion. (See title 11 subsection 1402) that: A peace officer may stop any person aboard, or in a public place who the officer has reasonable grounds to suspect is committing, has committed or is about to commit a crime, and may demand the person, name, address, business, abroad, and destination.

The Standard Scope of Review

The standard Scope of Review is whether the defendant's Fifth Amendment Rights were violated by police when failed to administer defendant Miranda warning at time he was arrested and taken into custody.

Argument

Miranda has longed been recognized that the interrogation of a suspect in a custodial setting frequently contains in compelling pressures which work to undermine the individuals will to resist, and to compel him to speak where he would not otherwise do so freely. Minnesota vs. Murphy 465 v at 428,86 SCT 1136, 79 Ed 409 1984 quoting Miranda 384 vs at 467, 86 SCT at 1624.

Consequently, law enforcement officers may not subject an individual to custodial interrogation unless he is advised of specific rights, protective of his privilege against compelling self incrimination guaranteed by the 5th amendment.

Miranda 384 vs. at 466.86 SCT at 1623-24 Miranda v. State Del. Supreme. 607 A2d 1185. 1192. 1992 dismissed 505 v. 1247 113 act 28.120 L-Ed2d.1992. In Miranda v. Arizona 384 vs. 436, 86 act 1602 L-Ed.2d 694 1966. The United States Supreme Court extended the privilege to the in custody interrogation of a person accused or suspected of a crime at 467.86 act at 1624 Miranda's 384 vs. at 469 86. act at 1625. If the police take a suspect into custody and interrogate him without advising him of his 5th amendment rights, his answers cannot be introduced into evidence at a subsequent trial to establish the suspect's guilt

Beackner vs.McCarty 462 vs. 420 428.104. SCT 3144 82 L0Ed2d 377 1984. However a law enforcement officer became obligated to administer a restriction on a person's freedom at to render him in custody. Stansbury v. California 511 vs. 318 114 SCT 1526, 128 L-Ed.2d 293 1994.

In the instant case at hand in State v. Harris no 193 2004. The defendant was detained and subsequently arrested on May 7, 2003 on the evening of the above said date, at approximately 11:30 for an attempted robbery 1st degree, possession of a firearm during the commission of a felony. Plus conspiracy 2nd degree. *Lynn Harris*

During the course of the proceeding the testimony office Slover, the following questions were asked by the prosecution Mr. Walter 19-22.

Q: okay now when you stopped this individual you stopped him on the shoulder, correct?

A: correct

Q: can you describe the shoulder area?

A: it's a flat asphalt surface.

Q: were there any other pedestrians or anybody walking in the area?

A: no sir

Q: was this individual walking along the high way without a light?

A: yes

Q: now can you tell the court, please what was in your mind right before you pulled over?

2

A: as I came from the dispatch... I mean it was dispatch, it was subjects that placed masks over their heads and one of them placed a pipe in their clothing and they walking from 825 South DuPont to Pockets. Now I knew that obviously fro the dispatch this vehicle these people weren't suppose to be at 325 South DuPont Highway.

See transcript of suppression hearing pg. 20 – they just placed masked over their heads, put a pipe in... what appeared to be a pipe inside their clothes. You know it sound like a robbery was getting ready to happen at Pockets.

Q: can I ask you to stop a minute? What significance did you place on the report from the reporting reason that it appears to be a pipe? How did you interpret that?

A: I know some people can . . . . you know, are not familiar with certain guns or any kind of weapons. So the significance in a pipe is this could be a weapon that this person put inside their clothing. And the reporting person may not be able to determine that.

Q: but what conclusions did you draw from all the circumstances available to you with regard to that pipe description.

A: it could possibly be a shotgun.

Q: were you concerned for your safety at all when you stopped this individual?

A: absolutely because like I said, my thinking is this person might have a shotgun on him and when I pulled over to the shoulder, like I said, one unit was right on the right lane and II was on the shoulder. And this subject - Mr. Harris was walking North bound, had the knit cap on, had coveralls on him. So I mean I immediately got out of my vehicle because you know, I didn't....At this point I was concerned for my safety. I don't want to be sitting in my car when someone pulls out a weapon and I'm sitting there.

Q: now when you arrived, pulled up, where you in a marked state police vehicle?

A: yes, Delaware State.

Q: The other vehicle was whom?

A: trooper McLaughlin.

Q: was that also a marked police vehicle?

A: yes

Q: when you responded did you have your 360's on?

A: as I responded no

Q: how about right before you stopped?

A: as I stopped we both activated our equipment because I mean, especially him he's sitting on the right.

Q: when you say him, who are you talking about.

A: I'm sorry trooper McLaughlin.

Q: oh okay, would it be fair to say at that point that he was seized he wasn't free to lave was he?

3

A: that's correct. Se transcript of record Suppression hearing pg. 14-22. Leading up to the seizure of the defendant. Here at this point in time from the investigatory stop of the defendant he was not free to leave, but was under seize and no formal arrest was not made. And at this point the Miranda rights should have been read to him once he realized he was not free to leave. The record reflects this is officer Slover testimony.

See - state of Oregon v. Mathiasen
No 76-201 cited at 424 vs. 492 says that: the court today holds that for ------------------------ constitutional purpose all this is irrelevant because respondent had not been taken into custody or otherwise deprived of his freedom of action in any significant way.

Miranda v. Arizona Supra. At 444 86 sct at 1612. I do not believe that such a determination is possible on the record before us. It is true that the respondent was not formally placed under arrest. At the very least if the respondent entertain an objectively reasonable belief that he was not free to leave during the questioning then he was deprived of his freedom of movement of action in a significant way FN1.

See United States v. Hall 421 F2d 540 544 - 545 1969 C-A2 1969 Lowe v. United States 407 F29 139 1969 People v. Arnold 66 CA1.2d 438 58 CA1 Rpt 115 426 P2d 1467.

See also cases collected in Annot 31A.-6-R3d 565 581- 583 1970 and SUP 1976. It has been noted that as a logical matter A person who honestly, but unreasonable believes he is in custody, belief is reasonable, this such reason also are entitled to warning.

See LaFaue Street encounters and the constitution Terry Sibron Peters, and beyond 67 Mich-L rev 34105 14768. The question in applying Miranda. What constitutes custodial interrogation 25 SC. Rev 699711 714 1974.

In Furtherance the question was asked by the prosecution Mr. Walther

Q: Alright what did you do next?

A: um...as I explained to you, I exited my vehicle because I didn't know if he had a weapon on him or not, so I asked him to turn around for me, And I went to pat hm down before I put my hand on him, he said oh I have a shot gun inside my clothing.

See suppression haring transcript pg22
Once again officer Slover had the of fortune time to administer the Miranda rights to the defendant once he made the incriminating statement.
At this point in time officer Slover as experience police has been well trained to know when to execute Miranda warning, which reads

You have the right to remain silent, anything you say can be used against you in the court of law. You have the right to an attorney, if you cannot afford an attorney then one will be appointed for you. Do you understand these rights that I have read to you?

Citing Stansbury v. California no. 93- 5770 511, us 318 114 SCT 1526. We held in Miranda that a person questioned by law enforcement officer after being taken into custody or otherwise deprived of his freedom of action in an significant way, must first be warned that he has a right to remain silent. That only statement he does make may be used as evidence against him. And that he has a right to present of an attorney, either retained or appointed 384-vs-4486 SCT at 1612.

Statement elicited in non compliance with this rule may not be admitted for certain purposes in a criminal trial. At 492,444,86 SCT At 1637-38 Harris v. New York 401 us-222 91 SCT 643 28

led2d 1971. An officer's obligation to administer Miranda warning, However only where has been such a restriction on a person freedom as to render him custody.

Oregon v. Mathiason 429 vs 492 995-47 SCT 711-714 50 I-Ed2d 1471. See also Illinois v. Perkins 496 vs 292 296 110 SCT 2394-2397 110 L-E2d 243 1990, moreover the continuing questioning by Mr. Walther of officer Slover, as to what he did, further stated a that point.

A: I immediately took him into custody , took hold of the shot gun. He had a gun, I didn't want to go any further than what it has already has

Q: Did you pat him down

A; At that point I pattede him down and I actively felt the shot gun inside of his clothing, at which time I unzipped the coveralls removed the shotgun from his clothing.

Q: And did you then take him into custody

A: yes

Once again officer Slover failed to execute the reading of Miranda rights. In which he is obligated as a trained law enforcement officer. Prace officer and friend of this court. Second opportunity to read Miranda at that point. I  immediately took him into custody, took hold of the shotgun. He had a gun, I didn't ant to go any further than what it already has.

See Suppression hearing transcript pg 22-23 Thereafter question by Mr. Deely asked the following of officer Slover

Q: Now Mr. Harris is standing there with his hand out

A: yes

Q: You had him turn around you haven't asked him his name or anything at this point

A: correct

Q: is that correct

A: yes

Q: And you immediately begin to search him

A: yes

Q: Even though your prior report was there were several people. You got one individual who is walking innocently at this point, you see no suspicious activity, is that correct

A: That's correct

Q: He complied with al the commands is that correct

A: yes

Q: And even the fact he complied with all the commands you made no attempt to find out what he was doing in the area.
A: At that point my attention was soley on if he had a weapon  okay? I wanted to go home. It's at night so I want to make sure he doesn't have a weapon on him.  I don't want this weapon to come

5

out and fire at me and. . . .: I want to reset the scene

A: Sure

Q: Two police officers lights going, two police officers with guns, defendant is compliant follows all your orders you've seen no suspicious activity from this defendant

A: You don't know if he matches the description that was called in, are all these things true up to this point

A: other than matching description, the knit hat on his head

Q: And you immediately begin to pat him down

A: correct.

Here once again officer Slover failed to execute the reading of the Miranda rights warning when the third opportunity presents it's self to him, but fail to protect rights under the 5th Amendment of the Constitution. And as a skilled trained officer of law it's his civil cvivic duty to safeguard those rights of the defendant to ensure the Fundamental Fairness.
Further questioning by Mr. Deely

A: He was in the place where pedestrians would walk northbound on route 13.

A: Not in my opinion

Q: Well he's on the shoulder of the road. Isn't that where people are suppose to walk

A: "Yeah", but he's on the - - - a toot of the - - - off the solid white line. He's two feet from vehicles traveling at 50 miles an hour south bound

Q: And you found that suspicious?

A: No, I mean, that's not suspicious, but that's not what you asked me

Q: So if he was three feet off this side of the road that would have been okay in your opinion?

A: no if he was more towards where the asphalt meets the grass area
Q: now in that same paragraph, the next sentence says as you begin to pat him down, is that correct
A: yes
Q: It was not before you begin to pat him down was it
A: ;Yes

See Suppression Hearing Transcript pg 21 – 27

Q: Would you read the sentence to the court starting with as I begin
A: As, I begin to pat him down "D" stated that he had a shot gun inside his clothing.
Q: That's different from what you testified to earlier was - - - let me finish the question
A: Go ahead
Q: Was that you got out of your car, told him turn around " Amended, that to hands are in plain view" then you told hi to turn around and at that time you begin to pat him down . Is that your testimony now?
A: I went to pat him down yes
Q: And as you were patting him down --- As you begin to pat he said I have a shotgun in my pants

6

A: No as I begin- - -went to pat him down as I begin he stated that he had a shotgun in his clothings

Q: Well he's not looking at you so he doesn't know you're beginning to pat him down. He doesn't know what you're doing behind him, you're behind him at this point right? Is it your testimony now he's facing away form you and not knowing what you're doing or what you're going to ask him? He says I have a shot in my clothes?

A: yes I mean as I explained to you, always ask people - - -And as I did that night - - - do you have any weapons on you and as I begin to pat him down he stated he had a shotgun

Q: What does begin mean? You touched him

A: No it doesn't

Q: What does it mean

A: As I begin, As I went to, something I just used a different word there, as I begin

Q: So you walked up

A: If I was touching him, that would be during a pat down
Pgs 43 - 44 of Suppression hearing transcript.

Q: So you walk up to this individual taker your hands out of your pockets, his hands re in plain view

A: Correct

Q: Okay did you tell him to do anything with his hans after he took them out of his picket

A: I don't recall

Q: But they're in plain view

Q: Trooper McLaughlin is in the car next to you

A: yes

Q: And he's watching what you're doing?\

A: I would assume

Q: Hope so

A: Right exactly

Q: The procedure would be for him to be watching is that correct

A: Correct

Q: Did he get out of his car

A: I don't recall at that point, because my attention was directed at Mr. Harris.

On redirect the following questions wee asked of officer Slover by Walther

7

Q: Do you hve any idea whatsoever prior to the stop where the location of the reporting person was at at the tie that he was reporting the information.

A: Other than 325 South Dupont, I don't know, that's what I explained to the defense counsel

Q: Right, so if he was on the front step is thee a driveway or what?

A: Exactly

Q: As you approached the vehicle as you went out what were the first words you said as you recall today of the defendant
A: As I recall

Q: uh – huh

A: I had stated - - - um well in mu report which I stated that night, because I wrote this report nack then was remove your hands from your pocket. He had his hands in his pockets and I stated to him do you have any weapons on you I'm sorry ask him to turn around and stated did he have any weapons on you. And um at which time I went to pat him down. He stated that he had a shotgun inside his clothing.

Q: Before you laid a hand on him did he tell you he had a shotgun

A: yes Re-cross
Mr. Deely asked the following questions of officer Slover

Q: officer you just stated on redirect that you didn't know where the people reporting out of 325 were as they were calling into the police is that correct

A: Correct

Q: But we do know they said they watched him go in a certain direction

A: Correct

Q: And the car was in the drive way toward the front of the house

A: Correct

Q: Okay so we don't know preciscely what view they had is that correct

A: Correct

Q: When you stopped Mr. Harris you stated that you pulled your car up beside him and trooper McLauchlian pulled up his car. At that point he was not free to leave is that correct.

A: yes

Q: Did you tell him to stop or halt or anything to that affect

A: No

Q: You got out of the car and said take your hands out of your pockets

A: Yes

8

Q: And then you said turn around

A: Yes

Q: And he complied in both cases

A: Yes

Q: And at that time knowing he was a suspect in a crime and that he was not free to leave did you read him his Miranda rights

A: No

Q: But secured him, a question that may well incriminate him in that crime that you were investigating is that correct

A: yes I asked him a question

See pg 50 - 51

In ths line of questioning it was establish tht officer Slover unequivocally violated the protocol of administering and safeguarding those rights of the defendant. Offier Sover as a trained law enforcement officer should have known that once he realized the defendant made an incriminating statement against himself, he should have automatically administered rights

#1 When he was not free to leave
#2 When placed into custody
#3 When he begin to pat him down

When performing an investigative stop, when he failed to request the following information under 1902 and 1403 of title 11 Del. C wherein, the record will reflect all of the averred's made by the defendant and a clear and plain violation of officer Slover

Therefore, for the stated herein, the conviction should be vacated because of constitutional violation of officer Slover. In which he as an officer of the court to see the Fundamental Fairness of the constitutional are protected and upheld.

Respectfully Submitted

Lynn Harris    12/18/06

During the testimony of officer Slaver when the question were asked by Mr. Deely.

Q; So you said turn around?

A: Yes

Q: Did he turn around?

A: Yes

Q: Did you tell him to stop don't move?

A: No

Q; You just got out your car and said turn around?

A: I said, turn around and he turns around, and when he turned around, I asked him if he had any weapons on him. Before I even patted him down, he said he has a shot gun on him.

Q: So did you ask him his name?

A: At that point, I wasn't concerned about his name. I wanted to make sure he didn't have a weapon on him.

Q: So the very first words out of your mouth when you got out.

A: Absolutely. (See transcript of suppression hearing pg. 37).

In furtherance, here is a complete violation of officer Slover to execute the said statute delinate in title 11 subsections 1902 in performing an investigatory stop, the appropriate stop to take by asking the detainee his name, address, business abroad and destination. In officer Slover testimony given he state that, he wasn't concerned about his name, address, exc, when the statute protocol delinate's this in pertinent part. (See transcript of suppression hearing pg. 37).

Moreover. The question was asked by Mr. Deely.

Q: Let me go through it. How many people got out of the car at 325 DuPont Hwy for the recom call?

A: According to recom, I don't recall exactly how many got out of there.

Q: More than one?

A: Yes.

Q: Did it say where the individual's went? Did recom tell you where they went?

A: Northbound they're walking towards pockets?

Q: Did they say anything else give you any description at all?

A: Description of the subjects.

Q: Yes.

A: No they just---what they dispatched to us were the subjects.

Q: You don't know if they were white or black, r tall or short.

A: No sir.

Q: Skinny or fat?

A: No.

Q: So you had no idea what they look like?

A: No.

Q: All you knew was, there was more than one individual isn't that correct?

A: Yes.

Here, as in Altieri the facts continued in the all complaint were readily observable to anybody who saw the defendant. As in Nelson, the caller here stated only that the person was "suspicious" without providing any articulable support for the subjective conclusion.

Here when patrolman Echevarria his own observation added nothing to the 911 caller's statement and did not corroborate or particlularize the conclusory term suspicious; see Jones v state no,115,1998. In the course of officer Slover testimony when the questions were asked if "any" description at all of the suspect, and his reply to the question was no, and what physical characteristics given of the suspect and none were given, and or corroborate by his own observations adding nothing to the callers statement, and last but least description of the automobile driven along with the license plate, and if their view was obscure from the tipster in which they last sight of the suspects did not provide enough articulable fact's for the basis of reasonable suspicion.

I

4

In the case of state v. Harris 193 2004 the state has not provided or presented extrinsic evidence of reliability to support the anonymous tip.

A person particularity an anonymous caller's subjective belief that another person is suspicious of criminal activity (FN 72) – The fact that the 911 complaint referred to a suspicious black male rather than a person engaged in suspicious activity is troubling. We cannot imagine a circumstance where a police officer could objective corroborate a 911 caller's claim that a person, as distinct from a person's activity, is suspicious. We do not find on this record, however that the police used the color of the defendant's skin as an indicator of suspiciousness so as to lead to an inference of unwarranted stereotyping. The record in this particular case is consistent with the inference that the police relied in good faith, but erroneously, on insufficient fact's to provide it basis for reasonable and articulable suspicion.

Our finding that the 911 complaint alone did not suffice to establish reasonable and articulable suspicion requires us to search the record for any other evidence the police might have possessed to support a finding of reasonable and articulable suspicion sufficient to detain Jones.

In the instant case of state v Harris 193 2004 like Jones in the same sequence and scenario setting the police did not have sufficient fact's to provide the basis to detain Harris due to the lack of articulable and reasonable suspicion to the lack of articulable and reasonable suspicion.

The record fails to reveal any evidence. As the United State Supreme Court noted in white if a tip has a relatively low degree of reliability, more information will be required to establish the required if the tip were more reliable FN3. Here, the question is whether the evidence remaining once the tip is removed suffices to establish that patrolman Echevarria held a reasonable and articulate suspicion of criminal activity prior to the date without the benefit of the 911 complaint.

The first and fourth bases enumerated by the Superior Court cannot aid in establishing reasonable suspicion. The fact that patrolman Echevarria found Jones wearing a blue coat near 98 Karlyn Drive, by itself indicates nothing to suggest any criminal activity. FN73,446 vs at 330,110s.ct2412.

The second and third bases enumerated by the Superior Court that the event took place at night in a high crime drug area do not depend on the 911 complaint.

In Brown v Texas the United States Supreme Court held that a defendant's presence in a high crime area by itself, will not establish reasonable suspicion FN74443 vs.47,99 s,ct 2637,

In our opinion the fact that a defendant's presence in such a neighborhood took place at ten o'clock at night does not suggest a result different from that reached brown Courts generally use factors such as nihtmare and the negative reputation of a neighborhood as additional support to bolster.

A finding of reasonable suspicion, not as the sale basis on that finding FN75.

Reasonable and articulable suspicion cannot be based on a defendant's presence in a particular neighborhood at a particular time of day with no independent evidence that the defendant has committed, is committing or is about the framers of our constititutional protection's against unreasonable searches and seizure's.

The fact's presented by the state are not specific and articulable facts which taken together with rational in ference's from those fact's, reasonably warrant the intrusion. Therefore under our interpretation of 11 Del, C, 1902 and article 1-6 of Delaware Constitution, we find that patrolman Echevarria did not posses A reasonable and articulable suspicion to stop. Fn78

Here in this case Officer Glover stated that he feared for his safety in the Harris case, which the officer by blustering because he feared for his life does not give rise articulable suspicion to warrant an search. The

search in this case cannot be validated on the officer's concern for their safety. The state treat's the officer safety exception as something separate and distinct from the need for articulable suspicion.

But, officer safety, at least on this record does not obviate the court's obligation to possess independently the legality of the officer's action. We agree with the seventh circuit that while officer safety is both legitimate and weighlty it cannot in all circumstances justify a search or seizure; otherwise nearly any invasion of a persons privacy could be justified by arguing that the police needed to protect themselves from harm. See u-sv. Johnson 7th cir 170 F.3d 708, 718 1999 (Citations omitted) quoting Knowles v. Iowa 525 us 113, 119 S CT 484, 488, 142 Led 24, 492 119981. Here having one's hands in one's pockets does not, without more, satisfy the officer safety exception. The officer needs an articulable suspicion appropriate to the circumstance. See Knowles 525 v.s. 113, 119 S-CT AT 488 See Suppression transcript pg 21 thru 41 thru 48.

Wherefore for these reason and  considering the totalities and circumstance that police did not have articulate and reasonable suspicion to warrant an investigatory step of the tipster due to the lack of charity of the identification of suspects, height and race which rational inferences from these fact's given on the 911 call. There the judgment of convictions. Should be vacated because of the ability to execute the said statute of 1902 plus 1903 and violation of title 11 Del, C 11 1902 and article 1-6 Delaware constitution and 4th Amendment violation.

Respectfully Submitted

## SECTION II (4 PAGES)

Whether counsel was ineffective when he failed to file timely notice of appeal, which is his continued obligation pursuant to Supreme Court rule 26 'A' in violation of his 6th Amend Plus 14th due process rights.

## STANDARD SCOPE OF REVIEW

Whether counsels performance fell below the reasonable standard of his duties perfect the timely filing of his appeal into the Supreme Court violation of his 6th Amend Plus 14 Amend.

## ARGUMENT

On April 23, 2004 he was sentenced for the attempted robbery first degree that was effective May 7, 2003 in which he was sentenced to four years at level V.

On the court of possession of a firearm during the commission of a felony he is to be imprisoned for eight years at level V, consecutive to the forgoing, suspended after serving six '6' years at level V. for '2' years at level 'IV' home confinement. The defendant is to be held at level V until space is available at level IV. Level IV home confinement is suspended after '6' months for the balance of and/or to be served at level III.

The first five years of the sentence is a mandatory term of incarceration. On the count of conspiracy second degree he was sentence to one year level five '5' suspended immediately for one year of level II concurrent probation.

Notice of appeal from the order dated 04/23/04 in the superior court in and/for New Castle County by Judge Cooch. On May 10, 2004, Mr. Harris Filing his notice of appeal from the superior court sentencing order dated April 23, 2004. In a letter dated May 12, 2004 from the supreme court request's you file a written statement on/or before May 24,2004, indicating that you recognize your continuing obligation under supreme court rule

26 'A' to represent Mr. Harris in the above caption appeal see attached letter dated May 12, 2004. On May 18 the defendant received from Mr. Deely an enclosed copy of the formal notice of appeal which was untimely filed see attached notice. *Lynna Harris*

Braxton v state Del supr, 479 A,2d 831 '1484' A defendants trial attorney had a continuing obligation to represent the defendant on appeal, whether or not he was paid additional fee, and until such time as he was permitted to withdraw therefore, the attorney's failure to file a timely appeal constituted ineffective assistance of trial counsel. Dixon v state. Del supr 581 A. 2d 111s '1990'.

In the matter of Harris v state. Appeal No 143 2004 his court appointed counsel Mr. Deely failed to file a timely notice of appeal into the supreme court after his conviction from the superior as of April 27, 2004. The defendant filed a notice of appeal to the supreme court in return they informed Mr. Deely in a letter dated May 14, 2004.

In there letter the court requested for Mr. Deely to file a written statement on or before May 24, 2004 indicating that you recognize your continuing obligation under the supreme court rule 26'A' and please include with your statement a forma; notice of appeal see attached letter dated May 12, 2004.

Citing Eley v state 748 A2d 407 Del Supr '2000'. In liew of these fast's it took Mr. Harris to file a notice of appeal to the supreme court to make the prerequisite showing to this court that counsel was in fact derelict of his duties and in violation of the Supreme Court Rule 26A continued obligation.

Immediately thereafter, counsel forwarded a letter to the appellant stating that after reviewing the entire record of the trial that he has not identified any appealable issues to support an appellate brief filed by counsel.

Therefore, I will be filling a brief under Del. Supreme court Rule 26 'c' on your behalf on/or before October 31, 2004 with the supreme court of Delaware.

This will be a non-merit brief because there appear to be no errors of low in the record below which counsel could raise.

In the Delaware lawyer's rules of professional provides as follows Rule 31.A lawyer shall not bring or defend a proceeding or assert or controvert an issue therein, when is no non-frivolous basis for doing so, however, this does not preclude a lawyer from making a good faith argument for an extension, modification or reversal of existing law.

A lawyer for the defendant in a current proceeding, or the respondent in a proceeding that would result in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.

Counsel along with his 26 'C' brief filed his motion to withdraw as counsel. In his motion to withdraw counsel stated he has made conscientious examination of the record and the law and concludes that an appeal is wholly without merit see attached motion to withdraw.

It's the defendant's contention that for the sake of argument that counsel could not have possibly could have made a conscientious and over all review in camera and calling for an expansion of this record in it's entirety and possibly concluded that he could not make a good faith argument at the best interest of his client when this rule of professional code of ethics delineates as such.

Counsel knew and should have known that a lawyer for the defendant in a criminal proceeding that could result in incarceration may nevertheless so defend this proceeding as to require that every element of the case he established. 'Professional rules of conduct 3.1".

Moreover, the defendant contention is that after a careful review professional conduct rule 3.1. Counsel performance fell below the reasonable standard when counsel failed to make a good faith argument's on the following appealable issue.

Good faith argument on did the officer execute subsection 1902 and following the protocol of this section, by asking the following question. Name address, business abroad and destination counsel could have made a good faith argument under the corpus delicti rule which states that major or essential element of the offense. The gravement of a robbery or attempted robbery charge is a taking by force: see state v. Norris 73 And 740 "1950 The Common law offense of Robbery requirements the two elements, the taking of property "larceny" by violence or by putting the person in fear.

Counsel could have made an argument on the Miranda rights violation that was violated by police which is violation of 5 Amendment right.

Counsel could have argued did the police have articulable and reasonable fact's to warrant an investigatory stop of the defendant. Which violated his U.S.C.A Amend 4. Del. C Annotated Const. Article 1-6 of title II Del,c 1402.

In furtherance it's the defendant's contention that the reformentioned argument's he has assembled of these constitutional ground's and issue's he has raised in which he feel's that has considerable merit for this court's review that has been violated. And for counsel to state he finds no errow of law in the record below shows that counsel performance fell well below the reasonable standards to be competent. Counsel which denies him effective assistance of counsel.

The defendant content's that because counsel performance to file a timely notice of appeal the prejudice he would have suffered there from the right of his appeal to be heard and the deprivation's.

It's the defendant contention that after careful review of in camera fact's of the case at hand the record will reflect and depict's that counsel could have argue any number of point's of law, and errors that clearly and unequivocally manifest itself in and on the transcript of the proceeding's.

Moreover, counsel performance fell well below the reasonable standard as an effective assistance of counsel that is guaranteed the 6th Amendment and his own professional cannon code of ethic when it talked about good faith argument and to hold the state to prove every element of the offense.

Therefore: Since counsel was in dereliction of his duties the sentence should be vacated because of counsel egregious in which the defendant/appellant suffered prejudice.

Submitted

Respectfully
Lynn Hauis
12/18/06

**(6)**

8

## SECTION 3 (14 PAGES)

Whether the state failed to prove their case beyond a reasonable doubt under the corpus delicti rule to support the conviction for attempted robbery 1st degree with a deadly weapon charge in their case in chief deprived the appellant to a fair trial under the 5th Amendment plus denial of his due process right's under the 14th Amendment.

## STANDARD SCOPE OF REVIEW

Whether the state failed to produce substantive evidence and/or prove their case beyond a reasonable doubt and meet the prerequisites to support the conviction under the corpus delicti rule and the said statutes of title 11301 and 225 's'.

## ARGUMENT

It has been well settled law in the state of Delaware that in accordance to Del. Annotated code title II Section 301 that: 'A' In any prosecution an offense, the state has a prima facie case for the state consist's of some credible evidence tending to prove the existence of each element of the offense; 'b' no person may be convicted of an offense unless 'each' element of the offense is proved beyond a reasonable doubt. State v. Morris 91 A.2d 998 '1914'.

The defendant contends that in accordance of title II section531 which reads in pertinent part, that a person is guilty of an attempt to commit a crime if the person (1) intentionally engages in conduct which would constitute the crime if the circumstances as the attendant circumstances were as the person believes them to be any. (2) Intentionally does or "commits" to do anything which under the circumstance's as the person believes then to be; is a substantial step in a course of conduct planned to culminate in the commission of the crime by the person.

It's the defendant's contention that he allege's that the state did not prove their case in chief "sub judice" because all of the prerequisites in the a fore mentioned statue's in title II 301 and 531 it's to taking of substantial step and under the corpus delicti rule of the crime with possession of a deadly weapon during the commission of a felony. Generally, "corpus delicti" refers to the "commission of a crime bysome body" state v .Calvana. Del. O. T154 A 461 "1936". The term Corpus Delicti usually does not include the perpretratur's identity. Otherwise, Corpus Delicti would be synonymous with the whole charge; see generally wigmore evidence 2072 "ed 1940" vains this analysis, the corpus delicti of the felony weapon possession charge appears to be '1' that a felony was committed '2' that the perpretratur of the felony possessed a deadly weapon at that time. Citing Jenkins v. state 401A2d 83 affirmed.

The defendant's contend's that the state failed to show that the weapon allegedly possessed by the defendant during the crime was, on the dated of the crime, "deadly weapon" within the meaning of Del. Annotated rules title II section 225 's' 'FN3" police testimony revealed that the weapon which defendant allegedly possessed during the crime was test fired and in operable condition nearly one and a half year after the crime. That testimony constituted some credible evidence tending on the date of the crime. See II Del. C title 119301. Absent any evidence to the contrary, the jury could reasonably have inferred that the weapon was operable on the date of the crime.

FN3-11 Del. 6 title 11 225's' in pertinent part providedes deadly weapon includes any weapon from which a shot may be discharged.
Moreover during the course of the proceeding the prosecution admitted into evidence the 12 gauge shot gun that was inside of the defendant's coveralls that he was wearing. The prosecution then said your honor, by the way, I brought this in and had bet, Bramble make sure it was not loaded and it's operable see transcript pg 39. Here once again the prosecution upon submission of evidence did not offer any credible evidence as to the firing of the weapon; nor, testimony of officer Slover and Det. Bramble to prove that it was fired. This was in fact a deadly weapon in accordance to Del C. title II 225's' and/or the ballistic report to prove that it was

operable and capable of discharging or shot may be fired. It has been noted in the transcript of record, the court told the prosecution that they had not introduced any 404'b' type evidence. See pg 55 of transcript.

The court: now, if I may interrupt again then? Wouldn't it also be possible, and may I should be asking this to Mr. Deely later, but wouldn't it also be possible that the defendant was walking away from pockets, but still hadn't renounced or abandoned the crime anyway? See pg 55 of transcript.

Pros: Mr. Walther absolutely your honor. And if you.

The court: So I don't think the direction of the walker the defendant, is absolutely determined necessarily one way or the other. See transcript or record pg 55.

The Prosecution: Mr. Walther, but it's a significant factor. All right? But the other thing too is it doesn't really make sense, if as I've described it, this epiphany that the defendant has right after Paul Nocho tells him who's inside that he wouldn't say to Paul Nocho, hey, you know, that's it. But what does he do? All right. He just has him go back to the car and wait there placing in jeopardy as a--- as the driver of a getaway car. It just doesn't make sense he would do that especially with his background. See 55-56 of transcript.

The issue came down to, you know whether or not there was a renunciation that is a voluntary and complete renunciation as the term is used. And subsection C '1' of section 541 says when it's not a voluntary and complete renunciation, it neither in whole nor in part, if there is a belief that circumstances exist which increase the probability of detection or apprehension of the accused or another participant. The state suggest that given the defendant's uncorroborated testimony, even uncorroborated by his own brother and even uncorroborated by one of his own co-conspirator's he says it was a complete and voluntary renunciation. See transcript of record pg 56.

It's the state contention since their defense is soley based on title II section 541 c1 renunciation. The defendant's defense one of affirmative defense totally contrary to the state's.

During the course of the proceeding the following question was asked of the defendant by the prosecution Mr. Walther transcript pg 13-15.
Q: It is a fact that when you and Marques Comer, and Marques Comer being your brother before the robbery that you had a discussion with your coconspirators that you were going to rob Pockets Liquors correct?
A: Yes.
Q: In fact, it was your idea; you're the one with the expertise, correct?
A: No, it was everybodies idea. Wasn't particularly my idea.
Q: Well everyone agreed correct?
A: Yes.
Q: All right, and are you saying that it was someone else's idea, not your idea to commit robbery that night?
A: Not saying that is was – repeat the question again.
Q: Was it your idea-whose idea was it?
A: No it was not.
Q: whose idea was it?
A: I'm not sure whose idea was it, but I blended in with the conversation.
Q: All right. So discussion took place before you even.
A: Yes.
Q: In fact isn't it true that you decided who was going to do what?
A: Yes.
Q: In fact you decided that Comer was going to be the driver of the get away car right?
A: Comer.
Q: Excuse Nocho.
A: Yes.
Q: Right, and you decided that you and Marcus Comer would go in and actually commit the robbery, correct?

A: Yes.

Q: And you decided that Dekelvin Townsend would be the lookout correct?

A: Yes.

Q: Isn't it fair you were calling the shots that evening?

A: Everybody agreed, I wasn't calling the shot's.

Q: When you told them what their roles were they agreed, correct?

A: Yes.

Q: Now before you left, did you make any attempt to get ant type of a disguise?

A: Yes, we did.

Q: All right, so everybody did whose idea was it to get a disguise?

A: It wasn't nobody—wasn't no particular person's idea. Everybody assumed to get a disguise.

Q: Are you just saying that it seemed like a reasonable thing to do, if you're going to commit a robbery, that you have some type of disguise.

A: Yes.

## Complete Renunciation transcript 27-41

Q: Alright, and he comes back, and apparently you came from the back of Pockets, this area over here, the grassy area with trees and you meet up with him.

A: Yes, I was in the woods, not all the way in, the end of the woods.

Q: And he say's to you there's some people in there right?

A: Two clerks.

Q: That's it just two clerks.

A: I am a little confused, all right? You had already planned to commit a robbery with a weapon, and you decided not to commit the robbery because there were two clerks there?

A: No.

Q: Is that what you're saying?

A: I decided not to commit the robbery we all were endangering each others lives and individuals that would also be in there.

Q: Well, how is your life in danger when you have a loaded shotgun?

A: How my life was in danger-yeah.

Q: Well, they weren't armed? Your co-conspirators weren't armed, were they?

A: It was petty – I was putting them in danger as well as myself.

Q: The only one you were putting in danger was Marques Comer your brother.

A: Everybody.

Q: All right, well they the plan wasn't for Dekelvin Townsend and Paul Nocho to go into the store with you, correct?

A: It was not.

Q: So when Paul Nocho when you confront Paul Nocho after he comes out and he tells you about there being two clerks, all right. You according to your testimony today, decided wow, this is dangerous I don't want my brother and these people to get hurt in this robbery, right?

A: That and other thoughts that I had.

Q: All right, but one of you thought of public safety – correct?

A: Public safety of myself and my brother and friends.

Here you will see that the defendant clearly and unequivocally voluntary renunciated from committing this robbery. In the Del Annotated rules title II subsection 541'b' that in any prosecution for an attempt to commit a crime it is an affirmative defense that under circumstances of the criminal purpose, the accused avoided the commission of the crime attempted by abandoning the criminal effort.

The record does reflect that the defendantmade every conceivable effort of the renunciation of this crime, here are the affirmative the defendant took.

11

**Transcript of record pg 13-48**

1. Never went into the premises of Pocket Liquor
2. Turned over the shot gun that was in this possession
3. He had decided not to commit the robbery because all they were doing was endangering other peoples lives, and that he was putting himself in harms way.
4. That there's a better life than robbing people. I thought about myself for once.
5. That he told his brother that this is not going to happen.

**See transcript of record  pg 13-48**

After looking back on the record, it will actually depict that there was a clear unequivocal renunciation to commit attempted robbery, and the defendant did take affirmative substantive step to "avoid" this crime from being prevented.

The court: note that but there's a little further evidence than just to "testimony". I'm not trying to anticipate Mr. Deely's argument, but to the extent maybe reasonable doubt exist's as to which way the defendant was walking on South bound 13, to the extent that the evidence would suggest he was walking away from the store, that might be arguable corroborative evidence to his abandment of the crime. As of testimony, the defendant contend's that title II 531 attempt to commit a crime, it states the elements of proof of attempted robbery. Which reads in attempted robber case, that state "must" establish "some" evidence other than the defendant's "confession", which tends to show that the defendant 10 attempted to take; exercise control over or obtain the property of another, 2) by the use or threat of immediate force.

Court: Here once again the court, the prosecution has not offered any 404'B' evidence as to the element's of attempted robbery of property has been taken and/or the proof that merchant Mr. Patel life was placed in fear. This type of evidence under 404 'B' the prerequisite of the charge the state lack corroborating proof they need to support the conviction beyond a reasonable doubt and in accordance of title II subsection 301.

Under Delaware law, a person may be convicted of robbery if he uses or threatens to use immediate force upon another in the course of committing theft, with the intent to "compel the owner of the property" title II Del C. 831 '2'. Morrisey v state del Supr 620A2d207.213. A person is guilty of theft when he takes, exercises control over or obtains property of another intending to deprive him of it or appropriate title IIDELC841. During the course of robbery, person displays a deadly weapon is armed with and uses or threatens to use a dangerous instrument, or otherwise threatens to use it and causes physical injury to any non participant, the degree of the crime is elevated from second to first degree robbery title IIDELC 832.

A person is deemed to have attempted to commit a crime if he intentionally does or omit to do anything which under the circumstances as he believes them to be, is a substantial step is destined as an act or omission which leaves no reasonable doubt "as to the defendant's intention to commit the crime for which he is charged with attempting" title II DELC 532.

In Dejesus v. state 655 A2d 1180. In order to carry it's burden of providing the element's of attempted robbery in this case, therefore, the state had to establish that Dejesus took a substantial step to take some property from Robinson by use of force or threat, and that he had specific intent to commit the offense of robbery.

This court has not addressed the issue of corpus delicti as it relates to an attempted crime. Our previous encounter with the corpus deliciti rule involved consummated offense.

See Stokes v state402A2d376 1975 robbery. We recognize that in the context of inchoate crimes such a attempts, the traditional application of the rule is difficult because. By definition, these crimes do not include a tangible injury or loss which can be isolated as the focus of the corpus delicti. See McCormick on evidence 143

12

oss which can be isolated as the focus of the corpus delicti. See McCormick on evidence 143 at 560, state v Parker 315N-C-222,337 8 E-2d at 443. See also Smith v. united states 348 US at 154-75 SCT at 149.

In a robbery case, the corpus delicti is clearly discernable as the physical property taken by force from another. In a case of attempted robbery, however, the injury or loss is far less tangible and, indeed no loss or taking at all may occur where the robbers efforts are foustrated. In such cases, the defendant is moving toward the commission of a crime which is not, and may never be consummated. Thus, an inquiry into whether the defendant engaged in conduct which a substantial step toward a robbery may be more demanding than whether there has been physical taking of property.

Nevertheless, we believe that the crime of aptempted robbery carries a distinct corpus delicti. In order to establish the corpus delicti for any crime, the prosecution must introduce independent evidence of the criminal conduct forming the gravement of the offense. See McCormick on evidence 145 at 558 mayor or essential element of offense.

The gravement of a robbery or a attempted robbery charge is a taking by force. See state v. Norris 45 DEL 333 73 A 2 d 790 '1950'. The common law offenses of robbery required two element's: taking of property, larceny by violence or by putting the person in fear.

Wherefore: for the reason stated herein, The appellant hopefully and respectfully pray's that this honorable court vacates this conviction since the state lack corroborating evidence to support the conviction and those prerequisites need to convict attempted robbery and possession of a deadly weapon by the taking of property and/or placing the merchant in immediate fear. In the interest of justice without prejudice.

Respectfully
Submitted

Lynn Harris
12/18/06